## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT A. HAYDEN, JR., | ) |
| KENNETH J. SOWERS, | ) |
| ANTHONY J. ZANGHI, on behalf of | ) |
| themselves and others similarly situated, | ) |
| | ) CIVIL ACTION NO. 3:2007-201 |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) JUDGE GIBSON |
| FREIGHTCAR AMERICA, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

This matter comes before the Court on Robert A. Hayden, Jr., Kenneth J. Sowers and Anthony

J. Zanghi's (hereinafter collectively "Plaintiffs") Motion to Certify Class (Document No. 2), Motion

for Preliminary Injunction (Document No. 4), FreightCar America's (hereinafter "Defendant" or

"FCA") Motion to Strike Paragraphs and Exhibits from the Declaration of Tom Vatavuk (Document

No. 63) and Plaintiffs' Motion to Supplement Record of Preliminary Injunction Hearing and for Leave

to Amend Their Proposed Findings of Fact and Conclusions of Law (Document No. 80). For the

reasons stated herein, the Plaintiffs' Motion to Certify Class, Motion for Preliminary Injunction, and

Motion to Supplement Record of Preliminary Injunction Hearing and for Leave to Amend Their

Proposed Findings of Fact and Conclusions of Law are granted and the Defendant's Motion to Strike

Paragraphs and Exhibits from the Declaration of Tom Vatavuk is denied.

## I. Synopsis

The case *sub judice* concerns a claim made by the Plaintiffs that the Defendant violated § 510 of the Employee Retirement Income Security Act (hereinafter "ERISA"), codified at 29 U.S.C. § 1140, by interfering with Plaintiffs' eligibility for their pension rights and related welfare plan benefits. The Plaintiffs seek class certification of employees who have suffered from this alleged discrimination. The proposed class would include those individuals who were furloughed prior to their attaining the necessary years of service under the terms of the Pension Plan, *see generally* Howard Declaration, Exhibit 1 (Document Nos. 24-12, 24-13), for a deferred vested pension (requiring five years of service), and two types of special pensions, a Rule-of-65 pension (requiring twenty years plus one day of service) and a 70/80 pension (requiring 15 years of service). *Id.* (Document No. 24-12) at pp. 11-12. The Plaintiffs are members of the United Steelworkers of America, Local 2635 (hereinafter "USW" or "union") but the proposed class would not include all of the union employees of the Defendant. The USW has entered into a collective bargaining agreement (hereinafter "CBA") with the Defendant that expires May 15, 2008.

The Plaintiffs allege that the Defendant engaged in a systematic process of furloughing them and the other members of the proposed class beginning in March 2007 and continuing in July and August of 2007 in order to prevent them from attaining the necessary amount of service time with the Defendant in order to interfere with their eligibility for their respective pensions. Although the pensions will be described in further detail later in this Memorandum Opinion, it should be noted that employees of the Defendant continue to accrue service credit toward their pension eligibility for a period of up to two years on furlough status. Generally speaking, if a furlough lasts more than two

2

years, and if the other conditions of the pension, including required minimum age[1] are satisfied, the pension becomes payable to the employee. The Plaintiffs allege that the Defendant recognized the fact that service would accrue on a furlough and furloughed them in 2007 with the specific intent at that particular time to interfere with their pension eligibility because at that time the employees for the deferred vested pension group had less than three years service, the employees for the Rule-of-65 pension group had attained less than twenty years plus one day service and the employees for the 70/80 pension group had attained less than thirteen years of service. The Rule-of-65 pension group could be furloughed at a period of time within two years of the necessary service time because, unlike the other two pension groups, the members of that group were required to work one day into the twentieth year in order to qualify for a pension. Therefore, for example, employees in the Rule-of-65 pension group, who met all the other requirements for the pension and were furloughed despite having accrued over nineteen years of service, could not accrue the necessary twenty years plus one day on a furlough status because they had not worked one day into their twentieth year.

The Court also notes at this time a further difference between the terms of the Rule-of-65 pension and the 70/80 pension: assuming all other pension prerequisites have been met, a 70/80 pension can be realized by an employee when his "Continuous Service is broken by reason of a permanent shutdown [of the Defendant's Johnstown facility] or by reason [of a furlough of two years plus one

---

[1]The minimum age at which a deferred vested pension is payable to the employee can either be 60, 62 or 65 depending upon the circumstances of the employee's length of employment, including age and a "break in Continuous Service" and elections by the employee. Howard Declaration, Exhibit 1 (Document No. 24-12), pp. 12, 23. The age of employees who claim discrimination that interfered with their deferred vested pension benefits has not been placed at issue by the parties and the Court will not consider it any further at the moment. Any further reference to age requirements in this Memorandum Opinion relates only to the Rule-of-65 pension and the 70/80 pension, collectively known as "special pensions."

3

day]." Howard Declaration, Exhibit 1 (Document No. 24-12), p. 11. A Rule-of-65 pension can be realized upon a break in "Continuous Service" because of a furlough of two years plus one day, but is not available upon a permanent shutdown of the Johnstown facility. *Id.*

With this understanding, the Court proceeds to address the issues concerning the Plaintiffs' request for class certification.

## II. Motion to Strike Paragraphs and Exhibits from the Declaration of Tom Vatavuk (Document No. 63)

First, the Court addresses the declaration of Tom Vatavuk (Document No. 56) and the matters therein that the Defendant seeks to strike. The Court notes at the outset that evidence submitted for use in a determination of the issue of class certification need not be admissible at trial. *See Vinson v. Seven Seventeen HB Philadelphia Corp.*, No. Civ. A. 00-6334, 2001 WL 1774073 at * 20 n. 28 (E.D.Pa. October 31, 2001). With this understanding, the Court finds that the declaration is admissible for purposes of the Motion to Certify Class.

Mr. Vatavuk's affidavit is based upon his personal knowledge. If he were a union member with little seniority and without a leadership position, the Defendant's challenge to his knowledge may have merit. However, Mr. Vatavuk possesses 19 years of seniority with the Defendant and is secretary of the "grievance committee", *see* Declaration of Tom Vatavuk, ¶ 2, and such is the basis of his personal knowledge. In paragraphs 9 and 10 of his declaration, Mr. Vatavuk is speaking as to 29 persons who have decided to resign from their employment to "receive payments from the Benefit Fund"; such knowledge would be particularly available to Mr. Vatavuk because of the fact that the local union has grieved the layoffs which affected these 29 individuals separate from this civil action.

The Court finds the Defendant's challenge to this portion of the declaration puzzling in light

4

of the fact that the Defendant relies on this figure of 29 resignations to support its attack on the Plaintiffs' initial proposed definition for the proposed class:

> The manifest complications created by Plaintiffs' proposed definition do not stop there. Even if the Court were permitted to certify a fail-safe class, there are numerous individual inquiries remaining. An individual employee would not necessarily "accept" reinstatement even if the Court determined that he was so entitled. For instance, some laid-off employees may decide to retire and accept severance, and others may have found new positions. [6]
>
> [6] The Declaration of Tom Vatavuk, filed by Plaintiffs on November 13, 2007, illustrates FCA's point. That Declaration states that 29 members of the five-year group have resigned, four members of the special pension group have resigned and two members of the special pension group have died. If so many have resigned or died since being laid off, then it is clearly possible that, even if reinstated, more would resign (or die) before working through 2008 or 2009.

Defendant's Brief In Opposition to Plaintiffs' Motion for Class Certification, (Document No. 59), p.

9. Defendant's position as to the value of Mr. Vatavuk's knowledge is inconsistent to say the least. On this point, the Defendant's motion is denied. The Court will address the issues of the class definition in another section of this Memorandum Opinion.

As to the challenges to the foundations of Exhibits A and B attached to the declaration, the Court finds no merit to them. Despite the unexplained markings on the two seniority lists in Exhibits A and B and the lack of a detailed explanation of the type of "review" Mr. Vatavuk conducted, he could have alternatively recited within his affidavit the names of the individuals from the November 9, 2007[2] seniority list who continue to work for the Defendant and those who have resigned based upon a comparison with the March 23, 2007 seniority list. If the Defendant has a question or has observed a discrepancy with the names Mr. Vatavuk's review has produced, it could just as easily have produced

---

[2] Although referred to by Mr. Vatavuk as the "November 2, 2007 seniority list", *see* Vatavuk Declaration at ¶ 8, the list at Exhibit B is in fact dated November 9, 2007.

a payroll or seniority list of its current hourly employees to refute his declaration. It could have also offered its own list of individuals hired between December 21, 1987 and March 31, 1989 who have been furloughed. Nevertheless, the Court has such lists before it in addition to a copy of the CBA (*see* Karan Declaration, Exhibit 2 (Document No. 24-7)) and the pension plan (*see* Howard Declaration, Exhibit 1 (Document No. 24-12, 24-13)) and should its own "review" of the seniority lists be necessary, it can conduct one to verify the declaration of Mr. Vatavuk.

Mr. Vatavuk has also explained the markings next to those names that are referred to in his declaration. The Court sees no need for Mr. Vatavuk to explain the other markings on the documents at this point so long as the Exhibits support his declaration. Although the form may not be the cleanest presentation made to the Court, it is certainly acceptable for purposes of the declaration Mr. Vatavuk has made.

The motion to strike is therefore denied.

## III.  Motion to Certify Class

Initially the Court recognizes that the Motion to Certify Class was filed on August 15, 2007 prior to the effective date of December 1, 2007 for the current version of the Federal Rules of Civil Procedure. Federal Rule of Civil Procedure 86 operates to apply the current version of Federal Rule of Civil Procedure 23 and all other rules the Court will rely upon in this Memorandum Opinion unless the current version of a rule shall not apply by directive of the Supreme Court or this "[C]ourt determines that applying them in a particular action would be infeasible or work an injustice." Fed. R.Civ.P. 86 (a). The Court has not received any directive of the Supreme Court as to the new version of Rule 23 and this Court does not find application of the new version of Rule 23 to "be infeasible or

6

work an injustice." Therefore, Federal Rule of Civil Procedure 23, as amended on December 1, 2007 is applicable to this case.

## A. Definition of the Putative Class

In the case *sub judice*, the Plaintiffs originally set forth their arguments in favor of certifying a class of the following individuals:

The class is defined as persons:

a.     who are or were participants in the FCA Pension Plan or FCA Welfare Plan; and

b.     as to whom the USW had been their collective bargaining representative at the time of their layoffs in 2007; and

c.     who were either:

(i) among the more than 100 persons who were laid off pursuant to the announcement in the May 31, 2007 WARN Notice, and who will accrue sufficient years and service under the FCA Pension Plan to qualify for a Rule-of-65 or 70/80 Pension and associated benefits if they are reinstated and work through 2008 or 2009, **or**

(ii) among the approximately 70 persons who were laid off pursuant to the announcement in the February 16, 2007 WARN Notice, and who had been hired between August 16, 2004 and October 10, 2004.

Plaintiffs' Motion to Certify Class, p. 2.

The Defendant takes issue with this argument in that the definition of the class is made contingent upon the putative class members' reinstatements and continued employment through 2008 or 2009; in the Defendant's view this creates a "'fail-safe' class", that is a class that is only definable upon the rendering of a decision on the merits of the civil action. Defendant's Brief, pp. 7-8 (citing *Nudell v. Burlington Northern & Santa Fe Ry.Co.*, No. A3-01-41, 2002 WL 1543725 at *2 (D.N.D. July 11, 2002). *See also Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980). The Plaintiffs cite to

7

*Piper v. Portnoff Law Assoc.*, 216 F.R.D. 325, 329 (E.D.Pa. 2003) for the proposition that the exact number of class members need not be known (and the Court agrees), but as the Defendant points out, the Plaintiffs' definition of the class will never allow it to become a definable class prior to a ruling on the merits.

The Court agrees with the Defendant that if this original proposed definition is adopted a fail-safe class will be created as to those individuals who are seeking reinstatement in order to qualify for their "special pensions," *i.e.* the Rule-of-65 and the 70/80 pensions. In order to qualify under the definition proposed by the Plaintiffs for this group of individuals, the Court would have to order their reinstatement pursuant to ERISA, and then they would have to meet a second condition of continued employment through 2008 or 2009 depending upon how much time they would be required to serve to meet the service and age requirements of their respective pensions, assuming that FCA's Johnstown facility is still in operation during those years. Indeed, the uncertainty concerning whether the individual Plaintiffs will choose to return to work at the Johnstown facility and the uncertainty surrounding the Defendant's continued operation of the Johnstown facility preclude a determination as to the issue of numerosity under this proposed definition. See *In re Paxil Litigation*, 212 F.R.D. 539, 545 (N.D.Cal. 2003).

The Plaintiffs set forth a second attempt to define their proposed class after the filing of the Defendant's response to their present motion. This latest proposal reads:

Plaintiffs seek to represent a class consisting of all persons:

(a)     who are or were participants in the FCA Pension Plan or FCA Welfare Plan; and

(b)     as to whom the USW had been their collective bargaining representative at the time of their layoffs in 2007; and

8

(c)     who were either

　　(i)     among the approximately 100 persons who were laid off pursuant to the announcements in the February 16, 2007 and May 31, 2007 WARN Notices and who were eligible to qualify in December 2007, 2008, or 2009 for a Rule-of-65 or 70/80 Pension and associated benefits, or

　　(ii)     Among the approximately 82 persons who were laid off pursuant to the announcement in the February 16, 2007 WARN Notice, and who had been hired between August 16, 2004 and October 11, 2004.

Plaintiffs' Reply (Document No. 71), p. 2.

The Plaintiffs explain that with this definition, specifically subsection (c)(i), "[c]lass membership does not require that an individual be reinstated or work for the requisite period, only that he or she would qualify for a Special Pension should they be rehired and work until pension-eligible." Plaintiff's Reply Brief, p. 3. However, as it stands now, the CBA between the Defendant and the USW continues until May 15, 2008. The Plaintiffs' second proposed definition fails to consider this fact for those who would qualify with service continuing through 2008 or 2009. It also does not consider the resignations of proposed members of either the group in (c)(i) or (c)(ii), which according to the Vatavuk declaration have already begun to occur. These employees who resigned have voluntarily relinquished their rights to return to employment with the Defendant and the Court cannot see how their reinstatement, as requested by the Plaintiffs, could occur. Therefore, this proposed defined class remains speculative.

Nevertheless, the Court notes the recent opinion of its colleague, Judge Conti, in the matter of *Hohider v. United Parcel Service, Inc.*, 243 F.R.D. 147, 209-212 (W.D.Pa. 2007) wherein it is recognized that the district court has the power to modify the definition of a proposed class in the face of an objection to a proposed definition as well as the unique considerations to a proposed class seeking

9

certification under Rule 23(b)(2). Such considerations will be reached after analysis of the prerequisites

of Rule 23(a). The Court does note here that Judge Conti's opinion recognizes that certification under

Rule 23(b)(2) presents a focus upon the actions of the defendant who opposes the class. *Hohider* at

210. The Court recognizes the same considerations here and redefines the proposed class under (c) as

follows:

Persons:

a.       who are or were participants in the FCA Pension Plan or FCA Welfare Plan; and

b.       as to whom the USW had been their collective bargaining representative at the time of
        their layoffs in 2007; and

c.       who were either:

(i)      among the approximately 100 persons (currently living and who have not resigned their
        positions with the Defendant) who were furloughed pursuant to the announcements in
        the February 16, 2007 and May 31, 2007 WARN Notices and who, in the absence of
        such furloughs, would have met the age and service eligibility requirements for the
        Rule-of-65 or 70/80 Pension and associated benefits with continued service with FCA
        into December 2007, 2008, or 2009 respectively, ("the special pension group subclass")
        or

(ii)     among the approximately 82 persons (currently living and who have not resigned their
        positions with the Defendant) who were furloughed pursuant to the announcement in
        the February 16, 2007 WARN Notice, and who had been hired between August 16,
        2004 and October 11, 2004 ("deferred vested pension group subclass").

The Defendant's Response of December 14, 2007 (Document No. 76) presents some excellent

points regarding the inadequacies of the Plaintiffs' two attempts at defining the proposed class and the

Court addresses these with respect to its modification of the class definition. The Plaintiffs' attempts

to define the proposed class for the special pension group subclass were conditioned upon eligibility

for pensions by its members in the future and it failed to focus upon what had happened in the past and

10

the alleged criteria that the Defendant used to furlough the class members. Additionally, both proposed class definitions offered by Plaintiffs failed to consider the deaths or resignations of its potential members, which result in a reduction of the membership of the two subclasses; a factor that bears upon the numerosity consideration.

Plaintiffs' attempts at defining the proposed class are deficient in other aspects in that issues of future events such as the question of a Plaintiff's eligibility in the future that results in a "fail safe class", Defendant's Response, pp. 5-6, consideration of a particular Plaintiff's decisionmaking process to return to work or not if given the opportunity, *id*. at p. 6, and finally imposing a requirement on the Court to predict if the final condition for the special pensions will occur, that is whether the Defendant will shutdown the Johnstown facility (favoring the 70/80 pensioners who have attained the necessary service credit and age) or whether it will furlough all of the members of the subclass again after a court-ordered reinstatement thus satisfying the final eligibility criteria for the Rule-of-65 and 70/80 pensions. *Id*., p. 7. All of these future variables bring uncertainty to the class and create a "fail safe" class in contravention to Rule 23. Despite the Plaintiffs' unsuccessful attempts, the Plaintiffs' discrimination concerns are clear and allow the Court to define the class in an appropriate manner that permits certification rather than dismissal of this civil action.

The alleged motivation of the Defendant at the time of the furloughs is the factor the Plaintiffs have focused upon and, as recognized by the Defendant, any reference to future possible occurrences defeats the class certification. Focusing upon the Defendant's conduct in the past and the alleged motivation is what the Plaintiffs must rely upon as a basis to certify their class. The Plaintiffs' theory is that the Defendant took action to prevent the Plaintiffs from qualifying for pensions and related

11

welfare plan rights. The alleged discrimination must be reviewed from the time of its occurrence, and not through what can remedy the alleged discrimination, what the employees will decide to do in the future if given the opportunity to return to work, or under what conditions the Plaintiffs can now qualify for their pension rights. If the Plaintiffs' theory is correct, the information which was critical to the Defendant's decision to furlough, and also known by it prior to that decision, was the birthdates and periods of service of each Plaintiff.

If the Defendant was looking to permanently shift most of its work from the Johnstown facility to its other facilities in Danbury, Illinois or Roanoke, Virginia in order to avoid continued labor expenses at Johnstown, the decision to begin such a shift and a paring down of the Johnstown workforce with an extended furlough of over two years would be more beneficial from a financial standpoint if it occurred prior to many employees meeting the service requirements of a deferred vested pension, a Rule-of-65 pension or a 70/80 pension. If one were the Defendant, and wished to place its personnel on an extended furlough lasting more than two years, especially knowing such a decision is a trigger for eligibility particularly for the special pensions, then acting to implement such a decision at a time prior to such individuals satisfying the eligibility factor of necessary service time would be beneficial as a means of avoiding pension costs. Timing the furlough in such a manner would also prevent vesting of pensions by the deferred vesting pension group which would also relieve further potential financial obligations in the future. Of course, this hypothetical assumes discrimination on the part of the Defendant that has not been proven yet, but these alleged facts and motivations provide the basis for the Plaintiffs' theory.

In analyzing the Plaintiffs' theory further, the Defendant obviously cannot control the birthdates

12

of its workers, but it can control the length of the Plaintiffs' service with the Defendant. Knowing that the Rule-of-65 pensioners require one day of service beyond their twentieth year, that the 70/80 pensioners require certain minimum years of service combined with their ages and that under both of the special pensions a furlough longer than two years is a trigger for immediate pension payments and accompanying welfare benefits, all that was left for the Defendant to determine was the timing of the furloughs of the Plaintiffs to prevent sufficient service time, an eligibility factor squarely within the Defendant's control. The Plaintiffs also believe the furloughs were timed by the Defendant to prevent the vesting of the pensions for the deferred vested pension group. Based upon such a theory, it is the fact of a furlough and its specific timing, not whether pension eligibility will occur in the future, that control a definition of a class suitable for prosecution of the Plaintiffs' theory.

This latest version of the class definition formulated by the Court focuses upon the Defendant's acts of furloughing the individuals in question, making such acts the lynchpin of the certification, not the continued or future qualification for the pensions by the purported class. The Plaintiffs' attempts to define the class are attempts to gain a reinstatement of a sufficient period so that the service requirements for the various pension rights are satisfied. It is the Defendant's alleged act of interfering with the Plaintiffs' right to retirement income benefits by a furlough or otherwise that is the basis of an action under 29 U.S.C. § 1140, and the reason why reinstatement is the equitable remedy that is permitted. Of course, what may happen in the future to each of these workers is unknown: people may resign even if not furloughed, people may be terminated, people may pass away, the CBA between the Defendant and the USW may not be renewed before its termination on May 15, 2008, or the Johnstown facility may be closed because of OSHA violations or for other reasons. With the possibilities for the

13

future being multitudinous, the focus of the Plaintiffs for purposes of class certification must be directed to the actions of the Defendant that were allegedly taken with the intent to interfere with their attainment of rights to benefits in violation of ERISA. With a class definition that does not depend upon future occurrences, but only the decisions and actions of the Defendant with respect to the putative class's qualification for benefits under the CBA, this re-definition satisfies the Defendant's objections and the Plaintiffs' allegations.

Before concluding this discussion of class certification, the Court must consider the Defendant's argument that certain members, including former named Plaintiff, Samuel Pollak, if not all members of the 70/80 pensioners, who are part of the special pension group, may qualify for their pensions if the current decisional bargaining between the Defendant and USW results in a shutdown of the plant or if the current furlough persists for over two years. Defendant's Response, p. 4. If conditions are such that the 70/80 pensioners do qualify, they would not have met the latest definition proposed by the Plaintiff. *Supra* pp. 8-9. However, with the modification of the definition by the Court, this concern is eliminated. This is because the new definition only includes those special pensioners who have not qualified for the age and service requirements of their respective pensions. The Defendant argues that the Plaintiffs' latest attempt at defining the class failed because their definition only certifies the 70/80 pensioners and certifies them when they become eligible to obtain their pensions. Defendant's Response, p. 4. This point is well taken and has been considered in the formulation of the Court's modification. Only those who have not attained the age and service requirements of the Rule-of-65 and 70/80 pensions will be certified, and individuals, such as Mr. Pollak (assuming the Defendant's information is correct) will not be members of the class because Mr. Pollak is awaiting the final

14

condition of a plant shutdown or a two years plus one day furlough to activate his 70/80 pension.

The Court also notes the Defendant's point in footnote seven of its Response wherein those people identified in Tom Vatavuk's declaration who have passed away or otherwise resigned from their positions with the Defendant cannot otherwise be considered for possible reinstatement by the Court and therefore, are excluded from the class definition.

Finally, after considering the Plaintiffs' suggested action of certifying one class, the Court finds that the differences between Plaintiffs Sowers and Zanghi and Plaintiff Hayden, specifically their representation generally of members of the entire class would result in an issue with regard to their representation of class members who are not in their respective pension group. Therefore, two subclasses, the special pension group and the deferred vested pension group are appropriate to analyze and proceed with a possible class certification and beyond if certification is approved. The Court creates these subclasses pursuant to Federal Rule of Civil Procedure 23(c)(5) at this time because of the necessity for subclasses to meet all the requirements of certification under Rule 23. *See* 1 *Newberg on Class Actions* § 3:9 (4th ed. 2002).

With this understanding and redefining of the class, the Court proceeds to analyze the prerequisites of Rule 23(a).

## B. Federal Rule of Civil Procedure 23(a)

The Plaintiffs argue that the purported class meets all of the prerequisites of Rule 23 subsection (a) and also subsections (b)(2), (b)(1), or (b)(3) with (b)(2) being the preferred type of class action. Plaintiffs' Brief (Document No. 3), pp. 4-17; Plaintiffs' Reply, pp. 2-17. The Defendant opposes class certification based upon several arguments among which is that the purported class is too indefinite,

15

as it is defined based upon future events and decisions of its potential members as well as the fact that

the purported class contains two groups of workers, those seeking qualification for the special pensions

and those only seeking the vesting of their deferred pension benefits. Defendant's Brief, pp. 5-27.

First, the Court notes the applicable rule and standards. Federal Rule of Civil Procedure 23

states in pertinent part:

(a)  Prerequisites. One or more members of a class may sue or be sued as
     representative parties on behalf of all members only if:

     (1) the class is so numerous that joinder of all members is impracticable;
     (2) there are questions of law or fact common to the class;
     (3) the claims or defenses of the representative parties are typical of the claims
     or defenses of the class; and
     (4) the representative parties will fairly and adequately protect the interests of
     the class.

Federal Rule of Civil Procedure Rule 23. "[I]t is not necessary for the plaintiffs to establish the merits

of their case at the class certification stage, and that, in determining whether a class will be certified,

the substantive allegations of the complaint must be taken as true. *See Eisen v. Carlisle & Jacquelin*,

417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)." *Chiang v. Veneman*, 385 F.3d 256, 262

(3d Cir. 2004).[3] Indeed, the Third Circuit has stated "that class definitions must be free of merits

---

[3] It is recognized that Judge Conti of this Court has penned an extensive review that questions the continued validity of this standard in her opinion in *Hohider*, *supra*, in which she concluded that "District Courts are required *when necessary* to delve beyond the pleadings to determine whether Rule 23 requirements are met." *Hohider* at 163 (emphasis in original). As the reader will find, the Court in the case *sub judice* refers not only to the First Amended Complaint, but also the declarations and other materials submitted by both parties. Such additional materials submitted by the parties in relation to the outstanding motion for preliminary injunction have been used to analyze the Plaintiffs' class action allegations and to the extent they contradict the class action allegations, they have been utilized; those allegations in the First Amended Complaint that are not contradicted by the materials of record continue to stand unchallenged. This is noted particularly with respect to the number of individuals alleged to be within the class when compared to the Vatavuk declaration and the first proposed definition of the class set forth in the First Amended Complaint, which the Court saw fit to modify based upon an analysis of the Plaintiffs' legal theory of the case. Any legal analysis conducted herein is for the purpose of analyzing the prerequisites for class certification under Rule 23 and will not carry over to the Court's final decision with respect to the Plaintiffs' claims.

16

allegations that require extensive factual findings." *Id.* at 271. Furthermore, "a class defined with reference to the state of mind of its members will not be allowed to proceed under Rule 23" *Id.* at 272 (citing 7A Wright, Miller & Kane, *Federal Practice & Procedure* § 1760). With these understandings of class actions, the first issue to address is numerosity.

## 1. Numerosity

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

Federal Rule of Civil Procedure Rule 23.

The Plaintiffs allege that the purported class is sufficiently numerous in that it numbers "approximately 170 persons", and cite to *Stewart v. Abraham*, 275 F.3d 220, 226-227 (3d Cir. 2001), which found that "[n]o minimum number of Plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met. 5 James Wm. Moore, *et al.*, *Moore's Federal Practice* § 23.22 [3] [a](Matthew Bender 3d ed. 1999)." *See* Plaintiffs' Brief, pp. 6-7. Each subclass will be analyzed separately.

The first subclass of individuals included within the proposed class definition is composed of those "approximately 100 persons (currently living and who have not resigned their positions with the Defendant) who were furloughed pursuant to the announcements in the February 16, 2007 and May 31, 2007 WARN notices and who, in the absence of such furloughs, would have met the age and service eligibility requirements for the Rule-of-65 or 70/80 Pension and associated benefits with continued service with FCA into December 2007, 2008, or 2009 respectively, ("the special pension group

17

subclass"). The Court's modification satisfies the arguments of the Defendant as to questions of indefiniteness of those persons included within the special pension group subclass raised with respect to the Plaintiffs' proposed definitions.

Additionally, the second subclass which is composed of those individuals who are "among the approximately 82 persons (currently living and who have not resigned their positions with the Defendant) who were furloughed pursuant to the announcement in the February 16, 2007 WARN Notice, and who had been hired by FCA between August 16, 2004 and October 11, 2004 ("deferred vested pension group subclass")" is also capable of being defined. As the Plaintiffs' estimate that this group includes approximately seventy individuals, such number is sufficient to satisfy numerosity requirements of Rule 23(a)(1). Using the number of 53 (82 less the 29 individuals who "resigned" according to the Vatavuk declaration), numerosity would also be satisfied.

Despite the fact that the exact number of members of the putative subclasses need not be demonstrated, (although it appears that pursuant to this proposed definition that the members can be identified without difficulty after further discovery) the Court finds that joinder of all of the members of each subclass would be impracticable. *In re Rent-way Securities Litigation*, 218 F.R.D. 101, 112 (W.D.Pa. 2003). The difficulties that would ensue with joinder of such a number of potential parties under each subclass favor certification under Rule 23 in that repetitious actions by the Court may be required in evaluating each of these claims coupled with the fact that the equitable relief sought by the purported class is best resolved for the Plaintiffs and the Defendant in the form of a class action as it will present a conclusive resolution for a definite class to any claim sought against the Defendant. *See W. P. v. Poritz*, 931 F. Supp. 1187, 1193 (D.N.J. 1996)(citing *Weiss v. York Hosp.* 745 F.2d 786, 808

18

(3d Cir. 1984)). No matter what the approximation, the Court is satisfied that each subclass is of a sufficient number, and with application of the terms of the CBA, the pension plan, the evidence of record and further evidence that can be developed in discovery, membership of this class will be capable of exact definition.

Therefore, the deferred vested pension group subclass and the special pension group subclass each have satisfied the numerosity requirement of Rule 23(a)(1).

## 2. Commonality

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(2) there are questions of law or fact common to the class;

Federal Rule of Civil Procedure Rule 23.

"[T]he commonality standard of Rule 23(a)(2) is not a high bar: it does not require identical claims or facts among class member, as "the commonality requirement will be satisfied if the named plaintiffs share at least one question of law or fact with the grievances of the prospective class." *Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 184 (3d Cir.2001)." *Chiang v. Veneman*, 385 F.3d 256, 265 (3d Cir. 2004).

The two separate subclasses of the special pension group and the deferred vested pension group both satisfied the numerosity criterion, and each subclass also complies with the commonality requirement. This is because members of each subclass have an issue of law in common, the Defendant's alleged violation of 29 U.S.C. § 1140. Although the Defendant's alleged violation of this section of ERISA purportedly affected two distinct groups with different rights under their respective benefit plans, the Defendant's alleged action is still of the same character as to both subclasses in that

19

it allegedly affected the two different subclasses' "attainment of any right" in the benefit plans at issue. 29 U.S.C. § 1140. Although the facts concerning each individual's benefit plan in issue, time of service, hiring date (*e.g.,* August 16, 2004 and October 10, 2004 for all deferred vested pension group subclass members), and furlough date may be different (March or July /August 2007),[4] it is quite clear from the allegations of the First Amended Complaint (Document No. 13)(hereinafter "FAC") at paragraphs 1 and 2 that the Plaintiffs are claiming a violation of 29 U.S.C. § 1140 as to each member of both subclasses. This circumstance has been recognized as sufficient for ERISA class action claims by other courts. *See e.g., Brooks v. Educators Mut. Life Ins. Co.* 206 F.R.D. 96, 101 (E.D.Pa. 2002). Additionally, the special pension group subclass and the deferred vested pension group subclass appear to also have facts in common within each subclass and between the two subclasses, specifically employment with the Defendant, being members of the same local union which also makes them subject to the same CBA and all of their respective furloughs occurring in 2007. FAC ¶¶ 16, 35, 36. The exact furlough dates do differ between the deferred vested pension subclass (March 2007) and the special pension subclass (March or July/August 2007) thus making the subclasses distinctly identifiable in terms of another fact in addition to their hiring dates. The Court finds that the putative members of the two subclasses have satisfied the commonality requirement of Rule 23(a)(2).

---

[4]Although FCA's WARN Act notices were dated February 13, 2007 and May 31, 2007, the furloughs occurred in March, July and August respectively. Plaintiffs' Exhibits 24, 25.

20

### 3. Typicality

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

Federal Rule of Civil Procedure Rule 23.

The third prerequisite of Rule 23(a) requires that the claims of the class representatives be "typical" of the claims of the remaining class members. Typicality is *not* identicality. *See Johnston v. HBO Film Management, Inc.,* 265 F.3d at 184. The purpose of the typicality requirement is to ensure that the interests of the class representatives are aligned with those of the class as a whole. *See In re Prudential Ins. Co. of America Sales Practices Litig.,* 148 F.3d 283, 311 (3d Cir.1998). " 'Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.' " *Newton,* 259 F.3d at 184 (quoting 1 *Newberg on Class Actions* § 3.15, p. 3-78). *See also Georgine,* 83 F.3d at 631 (typicality is a bar to class certification "where the legal theories of the named representatives potentially conflict with those of the absentees"); *Baby Neal,* 43 F.3d at 58.

To the extent that there are differences among the claims of class members that implicate typicality, a court may create subclasses. *See Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985).

*Brooks v. Educators Mut. Life Ins. Co.,* 206 F.R.D. 96, 102 (E.D.Pa. 2002). This quote from Judge

Brody in *Brooks* succinctly sums up the parameters of the third class action prerequisite of typicality.

In the case *sub judice* those parameters are met. The deferred vested pension group subclass is

proposed to be represented by Plaintiff Hayden who has been furloughed and is accruing time toward

his deferred vested pension, but, unless he returns to work, he will never accrue the necessary five years

because he was furloughed prior to completing three years of service with the Defendant; the Defendant

recognizes only up to two years of furlough time as being credited toward the five years of service

necessary to vest a deferred pension benefit payable at age 65. FAC ¶¶ 12, 13, 35. Plaintiff Hayden

21

is among those who were furloughed in March 2007 who had not accrued at least three years of service with the Defendant at the time of furlough. FAC ¶ 35. The Court agrees that Plaintiff Hayden's claims are typical of the members of the deferred vested pension group as he as well as the putative class seek redress from an alleged violation of 29 U.S.C. § 1140 in the form of equitable relief. *See Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 57-58 (3d Cir. 1994). The Defendant's arguments to the contrary are bound up with the inclusion of the special pension group, but that is no longer an issue at this point in the analysis because of the Court's modification of the class definition. Therefore, the Court finds that Plaintiff Hayden is an appropriate subclass representative.

The claims of Plaintiffs Sowers and Zanghi are also typical of the special pension group subclass they offer to represent. FAC ¶¶ 10, 11, 36. They, like Plaintiff Hayden, have claims typical of their special pension group subclass in that they seek injunctive relief as a remedy to the alleged violation of 29 U.S.C. § 1140 that interfered with their rights to Rule-of-65 or 70/80 pensions. With similar dates of furlough and similar benefits at stake, Plaintiffs Sowers and Zanghi's claims are typical of their subclass of the special pension group.

The arguments of the Defendant as to lack of typicality fail with the presence of the two subclasses. *See* Defendant's Brief, pp. 13-14. Both subclasses have satisfied the typicality requirement. The Court notes that the Defendant reiterated concern for conflict among the class in light of the possibility of reinstatement and the need to conform to the seniority provisions of the CBA. Defendant's Response, p. 8-9. Our conclusion remains the same as this concern for seniority has no bearing upon the present civil action, which is based upon a request for redress as to alleged discrimination against certain union members, but not all union members working at FCA's Johnstown

facility. *See* pp. 27-28, *infra*.

### 4. **Fair and Adequate Representation of Interests**

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(4) the representative parties will fairly and adequately protect the interests of the class.

Federal Rule of Civil Procedure Rule 23.

As both the Plaintiffs and the Defendant correctly cite, the Third Circuit case of *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239 (3d Cir. 1975) sets forth the governing standard for adequacy of representation of interests issues under Rule 23(a): "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class. *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562 (2d Cir. 1968)." *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir. 1975). *See also New Directions Treatment Services v. City of Reading,* 490 F.3d 293, 313 (3d Cir. 2007) (citing *id.*) Although some existing case law proposes that a party opposing a class action must present evidence that the class will not be adequately represented (*see* citations included within *Szczubelek v. Cendant Mortgage Corp.*, 215 F.R.D. 107, 115 n. 4 (D.N.J. 2003)), the correct understanding of the burden for all four prerequisites under Rule 23(a) is that it is an affirmative burden upon the party proposing class certification, as opposed to a burden on the party opposing certification to disprove these prerequisites. *Szczubelek* at 115. To the extent that the case of *Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir. 1982) offers that the burden is upon the opposition to the class certification, such

23

case is inapposite as it concerns Rule 23.1 concerning derivative shareholder actions and Rule 23 and Rule 23.1 are procedural rules independent of each other. *Kauffmann v. Dreyfus Fund, Inc.*, 434 F.2d 727, 736 (3d Cir. 1970).

### a. **Absence of Antagonistic Interests**

The Defendant's first concern about whether Plaintiffs Sowers and Zanghi will meet the contingencies in the first proposed class definition is a moot issue as a result of the modification of the class definition by the Court. *See* Defendant's Brief, pp. 15-16. The Defendant next raises an argument as to the conflicts inherent in having the deferred vested pension group and the special pensions group in the same class because the seniority system at the Defendant's Johnstown plant requires reinstatements based upon which employee is the next individual among those furloughed with the most time of service with the Defendant. Defendant's Brief, pp. 17-18. The Defendant recognizes the issue that the senior members in the special pensions group may be tempted to settle for a partial reinstatement that only benefits the most senior of employees, while the members of the deferred vested pension group would favor reinstatement of every union member because they are the least senior of the employees from the Johnstown facility. *Id.* However, the Defendant viewed this issue through the original proposed definition of the class by the Plaintiff. Now with the Court's modification, the class definition contains two subclasses that remove any contention between the members of the subclasses. *See In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 800-801(3d Cir. 1995). As each subclass must meet the prerequisites of Rule 23(a), *see* Rule 23(c)(5), the Court preliminarily must determine if the proposed representatives each provide adequate representation for their respective subclass. Plaintiffs Sowers and Zanghi, although furloughed on

24

separate dates, possess interests in special pensions that are not antagonistic to members of the class who will qualify for a Rule-of-65 pension. However, the Court notes that the Plaintiffs sought to include with the Rule-of-65 pensioners those individuals who would qualify for a 70/80 pension and the fact that neither representative is in a position to qualify for a 70/80 pension. Additionally, a difference between the 70/80 pension and the Rule-of-65 pension is that upon a plant shutdown, those who have satisfied the service requirements (the service requirement is continuous service of fifteen years) for a 70/80 pension would receive their pension and do not need to work one day into their fifteenth year, while those seeking a Rule-of-65 pension who did not work one day *into their twentieth year* with the Defendant will not receive their pension upon shutdown or a furlough of over two years. *See* Stember Declaration (Document No. 6-10), pp. 8-9; *see also* Howard Declaration, Exhibit 1 (Document No. 24-12), pp. 11-12. Despite this difference between the necessary service time of these two pensions and the event of shutdown that would trigger the 70/80 pension but not the Rule-of-65 pension, it appears that the allegations of the Plaintiffs set forth a claim that all proposed members of this subclass require reinstatement and further service with the Defendant before they will have met the minimum requirements of either of these pensions. Therefore, the difference in service time or the need (or lack thereof) for a permanent shutdown as a trigger to commence a pension is not in issue with respect to the relief sought. The additional day that the potential pensioners under the Rule-of-65 must work is not a remarkable difference either, because the Defendant is alleged to have taken action to furlough the potential Rule-of-65 and 70/80 pensioners prior to the attainment of their necessary service times. Therefore, irrespective of the absence of a potential 70/80 pensioner being named a subclass representative, the Court finds that Plaintiffs Sowers and Zanghi have similar claims and interests to

those of the other potential recipients of a Rule-of-65 pension and a 70/80 pension in that both groups seek reinstatement as a remedy to the alleged interference with their attainment of pension rights. The Court concludes that Plaintiffs Sowers and Zanghi do not present claims antagonistic to their representative subclass because they seek resolution of a common issue, attainment of necessary service time. Moreover, they present claims similar to their purported subclass and have otherwise proven their interest, by retaining counsel for this matter as well as possessing the desire to resolve this litigation in favor of their purported subclass.

As for Plaintiff Hayden, his pension eligibility fits squarely within the situation of other members of the deferred vested pension group subclass. Plaintiff Hayden is without a known antagonistic circumstance to the circumstances of those he wishes to represent and like his purported fellow members of the subclass he worked less than three years for the Defendant before being furloughed in 2007.

Thus, the Court finds Plaintiffs Hayden, Sowers and Zanghi to be adequate representatives of the two respective subclasses.[5] Next, the question of the adequacy of the representatives' legal representation must be addressed.

---

[5]Although class actions may at times become expensive propositions for class representatives and certification has been denied on such bases, this issue has been considered mostly irrelevant in this circuit. *See Ferraro v. General Motors Corp.*, 105 F.R.D. 429, 431 (D.N.J. 1984). This Court does not see such an issue in this matter either as the subclasses are expected to number approximately 170 in total and the Plaintiffs seek certification primarily under Rule 23(b)(2), which in the event of successful certification, the Court is not required to order notification by the representatives to prospective class members.

### b. Subclass Legal Representation

First, in support of its argument that antagonism is present, the Defendant cites to the fact that reinstatement, if ordered by the Court as a remedy, would have to occur according to the seniority of the individuals at the Johnstown facility. Defendant' Brief, pp. 17-19. As such the Defendant suggests Federal Rule of Civil Procedure 19 becomes operative and requires joinder as parties of those individuals who are members of the USW Local 2635, but who are not members of the proposed subclasses. Defendant's Brief, p. 19, n. 14. *See also* Defendant's Answer to FAC (Document No. 54)(Twelfth Defense arguing for joinder of all other FCA employees from all three of its facilities). The Defendant argues that the members of USW Local 2635 who are not members of either proposed subclass and who possess more seniority rights than the special pension group subclass or who possess lesser seniority rights than the special pension group subclass, but greater rights than the deferred vested pension group subclass must be made parties to this civil action because they must be recalled from a furlough prior to the reinstatement of the deferred vested pension group subclass (hereinafter "'in-between' employees"). Defendant's Brief, p. 19. As honorable as the Defendant's proposed adherence to the CBA may be in the absence of Rule 19 joinder, the Court is certainly without power to require the reinstatement of the in-between employees as they are not presently parties to this civil action. As was stated by the Third Circuit in *McLendon v. Continental Can Co.*: "In granting injunctive relief, the court's remedy should be no broader than necessary to provide full relief to the aggrieved plaintiff." *McLendon v. Continental Can Co.*, 908 F.2d 1171, 1182 (3d Cir. 1990).

USW Local 2635 is not a party to this civil action; only certain members of the local union are plaintiffs. As the present Plaintiffs allege, the Defendant discriminated against certain members of

27

USW Local 2635 and it is only these specific members who may be found to have been discriminated against. Should the Court order reinstatement of the two subclasses, or only one, for example the deferred vested pension group subclass, the Defendant would have to reinstate the members of the deferred vested pension group subclass if they are the only subclass that has proven a case of discrimination under 29 U.S.C. § 1140. The Defendant could not avoid compliance with a court ordered reinstatement of this subclass based upon the Defendant's contractual obligation under the CBA to recall the most senior union members prior to recalling the union members in the deferred vested pension group. In the absence of Rule 19 joinder of the remaining members of USW Local 2635 and an order of their reinstatement, the Defendant will not be permitted to allow the CBA seniority system to trump any compliance with a court order should the alleged discrimination be proven. The Court will return to the issue of Rule 19 joinder later in this Memorandum Opinion.

While this discussion of reinstatement is purely hypothetical at this point, the potential for deficiency in the adequacy of the legal representation for the putative subclasses is present. The prudent course of action is for the Court to address this issue now, prior to discovery in this matter.

The Court recognizes that it is possible to review the present dispute one of two ways: either the two subclasses are antagonistic to each other as their reinstatement must be ordered according to the terms of the CBA or the subclasses are not antagonistic and the Court may remedy their alleged discriminatory furloughs by ordering both subclasses back to work, to the detriment to all other members of USW Local 2635. Despite the parties' apparent belief that the former view would prevail, the Court disagrees. If discrimination in violation of 29 U.S.C. § 1140 against the two subclasses occurred, the discrimination would be remedied by reinstatement. Although the benefit plans and the

28

rights thereto are defined by the CBA and the pension plan, the remedies for discrimination in violation of § 1140 are provided for in 29 U.S.C. § 1132 (a)(3) and the Court's review of the law does not reveal a requirement on the Court to adhere or defer to the terms of the CBA when ordering a remedy. Thus, reinstatement of two subclasses with differing terms of service and rights to recall under the seniority system recognized in the CBA will potentially work to the detriment of the those members of USW Local 2635 who are not parties to this action.

Finding that the two subclasses may co-exist and both obtain reinstatement simultaneously requires the Court to review who should be appointed as class counsel.

Attorney Stuligross, who is employed by the USW International loc ated in Pittsburgh, Pennsylvania has already appeared on behalf of the proposed subclasses in this matter. His appearance (Document No. 42) was entered after the entry of appearances by the other Plaintiffs' counsel (Document Nos. 9-12) and the filing of the present Motion to Certify Class (Document No. 2). The Defendant argues for the disqualification of Attorney Stuligross as class counsel because he "cannot represent some bargaining unit members against the interest of other bargaining unit members." Defendant's Response, p. 9. The Court agrees with the Defendant.

While his work thus far has shown no indication of an absence of vigorous representation, the Court finds that Attorney Stuligross's continued representation of the Plaintiffs cannot be permitted even in the absence of a class certification. Attorney Stuligross would be faced with an inevitable conflict between his duty to represent all members of USW Local 2635, those currently employed and those furloughed and their rights under the CBA, particularly the seniority rights, and the rights of the Plaintiffs, being less than all of the members of USW Local 2635, who seek vindication of their benefit

29

plan rights under ERISA particular to them by reinstatement to their positions with the Defendant. Such a conflict would interfere with the expectation of class counsel to "vigorously" prosecute a class action. *See Muth v. Dechert, Price and Rhodes*, 70 F.R.D. 602, 605 (E.D.Pa. 1976). Attorney Stuligross, a USW attorney, cannot be expected to advocate that the terms of the CBA remain in effect, but also represent interests that come into conflict with it. It is unclear how this civil action will be resolved, but the Court cannot find that Attorney Stuligross can competently serve the interests of the Plaintiff subclasses and the larger union at the same time and to even consider appointing him to such a duty would be judicial error. *See In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 799 (3d Cir. 1995)(discussing counsel's ability to "protect class interests"). Finally, separate from the conflict between his employment and proposed current representation, the record is absent any notation as to Attorney Stuligross's experience in class actions and the Court will not proceed blindly into an appointment of counsel in the absence of such information.

Turning to the qualifications of the members of the firm of Stember Feinstein to represent the two subclasses, the Court finds their appointment appropriate. The Court finds the qualifications of the firm of Stember Feinstein suitable for class counsel, particularly Attorneys Stember, Feinstein and Payne, who each present at least thirty years of experience and substantial experience and knowledge with class actions and complex litigation in such labor matters in addition to offering their expertise in education seminars, teaching and articles on such matters. Plaintiff's Brief (Document No. 3) Exhibits 2, 3, 4. Attorneys Ewing, Pincus, Cohn, although possessing less experience than their colleagues, each present diversified experience in labor law matters and at least ten years of experience

30

each along with judicial clerkships. *Id.* at Exhibits 5, 6, 7. These counsel have identified, with the help of information provided by the Plaintiffs and their union officers, the alleged violations and have poured through thousands of pages of documents. Additionally, they have investigated through their own efforts the public filings and reports regarding the Defendant and its operations and business plans. All of these counsel will undoubtedly provide a counseled and more than adequate representation of the interests of the subclasses. In light of the fact that this class is divided between two subclasses with very complicated and involved circumstances coupled with the fact that all of the attorneys are not competing with each other, but are from one firm, the Court believes that in this instance the appointment of these six attorneys from the same firm is appropriate. Therefore, the Court finds the six attorneys of the law firm of Stember Feinstein, (Attorneys Stember, Feinstein, Payne, Ewing, Pincus, and Cohn) will provide proper representation of the subclasses and they are hereby appointed to be the legal counsel for the class representatives.

## c. **Mandatory Joinder**

Turning back to the issue of mandatory joinder under Rule 19, the Defendant has raised the issue of conflict among the Plaintiffs and other furloughed FCA employees not purported to be members of any class or a party to this civil action because of the need to follow the seniority provisions of the CBA should reinstatement be ordered. Defendant's Response, pp. 8-9. Therefore, the Court turns briefly to the fate of the in-between employees.

This issue is one related to mandatory joinder under Federal Rule of Civil Procedure 19, not to any possible antagonism between members of the class and the proposed representatives. Should the facts bear proof that the Defendant did violate 29 U.S.C. § 1140, its choice to do so at the beginning

31

of a downturn in the freight car manufacturing industry was needless to say an ill-timed decision, but

is not a condition which must be evaluated by this Court in determining any possible *equitable remedy*

available to the proposed subclasses or any other plaintiff if a violation is proven. Any attempt to create

antagonism among plaintiffs by playing on future possibilities need not be countenanced by the Court

in this situation. *See Mamula, et al. v. Satralloy, Inc.*, 578 F.Supp. 563, 571 (S.D.Ohio 1983). To

ensure that any possible reinstatement of the subclasses certified today can be effectuated, the Court

must consider the rights of the in-between employees. Mandatory joinder is the vehicle through which

these non-parties can be heard on this issue before the Court now.

Federal Rule of Civil Procedure 19 provides as follows:

(a) Persons Required to Be Joined if Feasible.

(1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

(2) Joinder by Court Order. If a person has not been joined as required, the court must order that the person be made a party. A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff.

(3) Venue. If a joined party objects to venue and the joinder would make venue improper, the court must dismiss that party.

The issue of mandatory joinder under Rule 19 is one that may be raised *sua sponte*. *See MasterCard*

*Inter. Inc. v. Visa Intern. Service Ass'n, Inc.*, 471 F.3d 377, 382-383 (2d Cir. 2006). Therefore, the Court does so here.

The in-between employees face a threat to their seniority rights should the two subclasses be ordered reinstated to their employment.

Following the provisions of Rule 19, the Court finds that the present civil action is based upon federal question jurisdiction, 28 U.S.C. § 1331, and therefore, there is no issue as to a loss of subject-matter jurisdiction over this case for lack of diversity. Service of process of the in-between employees also appears not to be an issue because they presumably live within a reasonable distance of the Defendant's Johnstown facility. Proceeding to the question of whether this Court can provide relief to the "existing parties" in the "absence" of the in-between employees, the Court believes it can. The absence of the in-between employees does not impede the Court's ability to order and enforce any relief mandated. Nevertheless, when reaching the interests at issue, if reinstatement is ordered as a remedy, the Court finds the absence of the in-between employees would impair their ability to protect their seniority rights as well as simultaneously subjecting the Defendant to "inconsistent obligations" in that it is bound under the terms of the CBA to follow a certain seniority policy while also possibly being subject to a court order that would require reinstatement of certain USW Local 2635 members in a manner inconsistent with that seniority policy.

While the relief of reinstatement sought here is prospective at this juncture, the Court still believes it prudent to order joinder of the in-between employees as necessary parties to this civil action at this time because further delay until a future time when a reinstatement may be ordered at the conclusion of this civil action would prove untimely and most prejudicial as compared to joinder prior

33

to discovery or the summary judgment stage. The Court finds that the in-between employees, that is members of USW Local 2635 who are not currently parties to this civil action or not members of the subclasses as defined and certified today and who are either 1) currently employed at the Defendant's Johnstown facility or 2) who remain on furlough status from the Johnstown facility and who have not resigned or are not deceased shall be joined as Plaintiffs pursuant to Rule 19(a)(1)(B)(i) and (ii). The Class representatives shall move to join these persons within twenty days. *See Macklin v. Butler*, 553 F.2d 525, 531 (7th Cir. 1977).

With the Plaintiffs having satisfied the prerequisites of Rule 23(a) after modification by the Court of the class definition, the Court proceeds to evaluate the Plaintiffs' possible qualification under Rule 23(b).

### C. Federal Rule of Civil Procedure 23(b)

**(b) Types of Class Actions**. A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Federal Rule of Civil Procedure Rule 23. The Plaintiffs' primary argument for certification is certification pursuant to Rule 23(b)(2). The Defendant opposes this certification arguing: 1) that the Plaintiffs have not met their burden to show that the deferred vested pension group subclass *and* the special pension group subclass have been acted upon by the conduct of the Defendant because the Plaintiffs' theory is that John Carroll's decision was "focus[ed] on the special pension group" Defendant's Brief, p. 22; 2) the Plaintiffs' action truly seeks damages not equitable relief because they seek the reinstatement for purposes of obtaining the monetary benefits of employment arguing "[t]he injunction that Plaintiffs seek...is retroactive in nature and not prospective-it seeks to order FCA to reinstate employees, and the sole objective of Plaintiffs' injunction is to allow the class members to collect the pension benefits allegedly due them" Defendant's Brief, pp. 22-23; and finally, 3) the Defendant argues that the Plaintiffs' class is "not sufficiently cohesive to meet Third Circuit standards" because "individual issues completely pervade Plaintiffs' proposed class." Defendant's Brief, p. 24.

The Court disagrees with the Defendant's arguments. First, the Court agrees with the Plaintiffs,

Plaintiff's Reply (Document No. 71), pp. 14-15, that their allegations and cause of action concern both the special pension group subclass and the deferred vested pension group subclass and the Defendant's furlough actions toward them as an alleged act of interference with their pension rights is clear from the Amended Complaint. FAC ¶¶ 42-45. This assertion is clearly undisputed in the record.

Second, the Plaintiffs seek reinstatement to their employment with the Defendant. Although the prayer for relief in the FAC seeks monetary relief "to restore all affected Johnstown Employees to positions in which they would have been but for FCA's violations of Section 510 of ERISA, 29 U.S.C. § 1140" should the case of *Eichorn v. AT&T Corp.*, 484 F.3d 644 (3d Cir. 2007) *reh. denied*, 489 F.3d 590 (3d Cir. 2007), cert. denied, __U.S.__, 128 S.Ct. 709, 169 L.Ed.2d 571 (2007), be "overruled", the Plaintiffs request and are legally restricted to equitable relief, including preliminary and permanent injunctions. *Eichorn v. AT&T Corp.*, 484 F.3d 644, 654-655 (3d Cir. 2007).

The Defendant cites to *Selby v. Principal Mut. Life Ins. Co.*, 197 F.R.D. 48 (S.D.N.Y. 2000) for the proposition that the Plaintiffs in the case *sub judice* present a request for legal, not equitable relief because an order of court requiring reinstatement would "allow the class members to collect the pension benefits allegedly due them. The sole objective of Plaintiffs' injunction is to allow the class members to collect the pension benefits allegedly due them. Just like *Selby*, this remedy is monetary damages masquerading as injunctive relief, not a true prospective injunction that seeks to prevent FCA from doing something in the future." Defendant's Brief, p. 23. The Defendant's assessment of the Plaintiffs' claims is incorrect. As we approach the one year anniversary of the first round of furloughs, the Plaintiffs in both subclasses are currently accruing time toward qualifying for their respective pension rights. The record is clear that the Plaintiffs are accruing and can accrue up to two years of time to be

36

credited toward their respective pension qualifications while on a furlough, otherwise known to the parties as a "creep". *See* Defendant's Response (Document No. 76), p. 6. None of the class members are currently receiving pension benefits nor can they obtain pension benefits by returning to employment. This is because the Plaintiff subclasses are without sufficient service time to be eligible for special pensions or a deferred vested pension. Moreover, as was argued by the Defendant, the special pension group would have to return to work to accrue sufficient service times under their pensions and be furloughed for more than two years (or alternatively for the 70/80 pensions encounter a shutdown of the Johnstown facility) in order to receive their pensions. *See* Howard Declaration, Exhibit 1 (Document No. 24-12), p. 11.

The Plaintiffs seek reinstatement so that they may be permitted to work toward accruing the necessary service time for their respective pension rights. Any reinstatement of the Plaintiffs does not result in a backpay award or immediate payment of pension benefits. The Defendant furloughed the Plaintiffs who need more than two years of service toward accruing their pension rights. Unlike *Selby*, which involved a request for certification under Rule 23(b) (1) or (2) and an inventive request for equitable relief, that is ordering an insurance company to take action with respect to previously denied claims, an action that may have resulted in payment under the insurance policies, *Selby* at 59, n. 16, the Plaintiffs want to work toward accruing their pension rights and seek injunctive relief to prevent future actions of the Defendant allegedly taken to prevent them from working toward the necessary accrual of service time. To the extent that the Defendant labels the Plaintiffs' request for reinstatement as seeking retroactive relief, Defendant's Brief, p. 23, the Defendant is incorrect; the Plaintiffs are accruing necessary service time credit through operation of the "creep". Only in the event that the Plaintiffs are

37

not re-called to work after being furloughed for two years and are successful in their present claims will the remedy of reinstatement be required in a permanent injunction. After two years on furlough, the Plaintiffs will still not have accrued the necessary minimum service time toward their pension rights but would need to be re-called to employment by the Defendant in order to satisfy the necessary service requirements for pension eligibility. The timing of the furlough coupled with the "creep" and the inability of the Plaintiffs under such circumstances to be eligible for their pension rights lends support to the Plaintiffs' claims. The circumstances also are such that the equitable relief sought herein is truly equitable. As recognized by the Third Circuit: "As the Supreme Court has noted, the 'prototypical' claim under § 510 of ERISA is when an employer terminates an employee to prevent his pension rights from vesting. *Ingersoll-Rand*, 498 U.S. at 143, 111 S.Ct. 478. Under such circumstances, the typical remedy is reinstatement, which is an equitable remedy within the terms of the statute. 2 Dobbs § 6.10(5) at 226." *Eichorn* at 658.

Therefore, the Court finds that the Plaintiffs seek equitable, not legal relief in their claims for reinstatement and qualify for certification under Rule 23(b)(2).

Finally, the Defendant argues that the Plaintiffs' proposed class lacks cohesiveness. The Defendant cites to the fact that the merits of the claim must be considered when certifying the class and that the special pension group subclass and the deferred vested pension group subclass have differing interests with respect to their fellow workers and reinstatement. Defendant's Brief, p. 24. However, with the creation of the two subclasses and recognition that the two subclasses could be simultaneously entitled to reinstatement, the Court finds no lack of cohesiveness. The two subclasses seek a common goal, reinstatement, which is a goal that is attainable without conflict among the subclasses as to

38

seniority rights. *See Pichler v. UNITE*, 228 F.R.D. 230, 256-257 (E.D.Pa. 2005)(discussing the conflict among a proposed class regarding a common goal and how that differs from a common injury). The Court also notes that classes certified under Rule 23(b)(2) are cohesive by nature. *See Walsh v. Great Atlantic and Pacific Tea Co., Inc.*, 726 F.2d 956, 962-963 (3d Cir. 1983).

In conclusion, the Court finds merit to the Plaintiffs' motion for class certification and will certify the class, with two subclasses, as defined with the Court's modification set forth above under Federal Rule of Civil Procedure 23(b)(2), with the firm of Stember Feinstein, specifically Attorneys Stember, Feinstein, Payne, Pincus, Ewing and Cohn as class counsel.

## IV.    Motion to Supplement Record

The Plaintiffs have filed a Motion to Supplement Record of Preliminary Injunction Hearing and for Leave to Amend Their Proposed Findings of Fact and Conclusions of Law (Document No. 80). They seek to supplement the record with a copy of a Form 8-K that the Defendant filed with the Securities and Exchange Commission on December 18, 2007 "as an admission by a party opponent under [F.R.E.] 801(d)(2)(A)" or pursuant to judicial notice pursuant to *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) and to further amend their proposed findings of fact by amending the verb used in proposed paragraph 102 and adding a new paragraph 103. Plaintiffs' Motion, pp. 1-3; Exhibit B thereto. The Defendant opposes this motion arguing that there is a lack of "evidentiary foundation or context" for the information to be added and that the Form 8-K does not otherwise constitute an admission by a party opponent. Defendant's Brief in Opposition (Document No. 82), pp. 2-4.

The Court concludes that according to *Oran* it may take judicial notice of public forms filed

with the Securities and Exchange Commission and will grant the Plaintiffs' Motion in part as to their request to amend paragraph 102, deny it as to paragraph 103 and otherwise create two new paragraphs in its place that read as follows:

102. Pursuant to the controlling CBA, FCA may permanently close the Johnstown facility within 60 days of proving notice to the Union if the Company engages in decisional bargaining with Union officials after notice has been provided. Karan Dec. ¶ 36. In bargaining currently with the Union, FCA asked for $30 per hour in concessions. Karan Test., pp. 210-211.

103. Permanent closure of the Johnstown facility would prevent approximately 100 employees hired between December 21, 1987 and March 31, 1989 from attaining the 20 years of service required for a Rule-of-65 pension. Vatavuk Dec. ¶¶ 12, 13 & Exhibit A, pp. 1-7. Similarly, permanent closure of the Johnstown facility would prevent 82 employees hired between August 16, 2004 and October 11, 2004 from attaining the three years of service that would allow them to attain eligibility for a deferred vested pension through post-layoff service accrual. Vatavuk Dec. ¶¶ 6-7 & Exhibit A, pp. 8-10.

104. On December 18, 2007, the Defendant filed a Form 8-K which read in part:

On December 18, 2007, the Board of Directors of FreightCar America, Inc. ("the Company") approved a plan to close the Company's manufacturing facility located in Johnstown, Pennsylvania and relocate certain production from the Johnstown facility to other existing facilities. This action was taken to further the Company's strategy of achieving cost parity among its different facilities and lowering its cost structure. The Company had entered into decisional bargaining with the union representing its Johnstown employees regarding labor costs at the Johnstown facility but did not reach an agreement with the union that would have allowed the Company to continue to operate the facility in a cost-effective way.

The Company estimates that it will record a pre-tax restructuring and impairment charge during the fourth quarter of 2007 of approximately $34.3 million ($21.2 million, net of tax) in connection with the closure of the Johnstown manufacturing facility and cessation of operations at the facility. Approximately $28.1 million of this restructuring and impairment charge (on a pre-tax basis) relates to net curtailment losses and costs of contractual benefits arising under the Company's pension and other post-retirement

benefit plans. One-time employee termination benefits for severance and medical insurance are estimated to be $2.1 million on a pre-tax basis. The restructuring and impairment charge will also include a non-cash reduction of the carrying value of certain assets at the Johnstown manufacturing facility. These assets currently have a book value of approximately $4.1 million and are comprised of land, a building and equipment. The Company, with the assistance of an independent third-party valuation specialist, is currently performing a complete valuation analysis on these assets as well as estimating the costs related to preparing the facility for closure. The Company is also currently assessing potential capital expenditures at the Company's other facilities that will absorb production from the Johnstown plant and the cost to transfer equipment to these other Company facilities. Cash payments for one-time employee termination benefits will be made during 2008, while the cost of pension and other post-retirement benefits will be paid during future periods, in connection with additional funding of the Company's pension and post-retirement benefit plans. The foregoing figures are estimates, and the Company will not know the amounts of the anticipated costs and cost savings relating to the facility closure until it has finalized the details of its closure plan;

The Court does not have the same concerns as the Defendant with regard to context of the proposed facts of the Plaintiffs because the Court's version places the matter within the context that the Defendant sought to place it. Otherwise, the Form 8-K in its entirety cannot be disclaimed by the Defendant. The Court will also grant in part the Plaintiffs' motion as to the request to supplement the record with respect to the Form 8-K for purposes of the motion for preliminary injunction.

## V.  **Motion for Preliminary Injunction**

The Plaintiffs moved for a temporary restraining order or a preliminary injunction that would reinstate them to employment with the Defendant in accordance with *Eichorn v. AT&T Corp.*, 484 F.3d 644 (3d Cir. 2007) *reh. denied*, 489 F.3d 590 (3d Cir. 2007), *cert. denied*, __U.S.__, 128 S.Ct. 709, 169 L.Ed.2d 571 (2007); they sought reinstatement in order to be able to satisfy the necessary time of service requirements for their respective pensions. Plaintiffs' Motion (Document No. 4), ¶¶ 12-13. The Court denied the motion for a temporary restraining order on August 21, 2007 (*see* Memorandum

41

Opinion and Order of Court (Document No. 18)) and after permitting limited and expedited discovery

to the Plaintiffs (Order of Court dated September 11, 2007 (Document No. 29)), the Court held a

preliminary injunction hearing on October 3, 2007 and October 12, 2007. *See* Hearing Transcript of

October 3, 2007 (Document No. 48)(hereinafter "HT") and Hearing Transcript of October 12, 2007

(Document No. 51)(hereinafter "HT II").

After considering the testimony presented to the Court as well as the exhibits and other matters

of record for purposes of the motion for preliminary injunction, the Court makes the following findings

of fact[6] and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(2):

## A.   **Findings of Fact**

### 1.   **The Plaintiffs**

1.   Named Plaintiffs, Kenneth J. Sowers, Anthony J. Zanghi, and Robert A. Hayden, Jr., on behalf of themselves and others similarly situated (hereinafter "Plaintiffs"), seek preliminary injunctive relief f rom their employer, Defendant, FreightCar America, Inc. (hereinafter "FCA" or "Defendant"). *See* FAC (Document No. 13).

2.   Named Plaintiff and subclass representative Kenneth J. Sowers is a resident of St. Benedict, Pennsylvania in Cambria County. Sowers Dec. (Document No. 15-2), ¶ 2. Prior to August 11, 2007, Plaintiff Sowers worked at FCA's Johnstown facility. *Id*. at ¶ 3. Had he worked through April 5, 2008, he would have accrued sufficient years and service under the FCA's Pension Plan to qualify for a Rule-of-65 Pension. *Id*.

3.   Named Plaintiff and subclass representative Anthony J. Zanghi is a resident of Johnstown, Cambria County, Pennsylvania. Zanghi Dec. (Document No. 15-4), ¶ 2   Prior to March 31,

---

[6]The Court notes that many of the findings of fact have been quoted directly from the parties' submissions, or with minimal alterations, including the absence of quotation marks for the proposed fact, internal quotation marks that refer to the original source as well as much of the ellipses and bracketing for alterations to the language for the ease of reading. Certainly, any missing sentences or words from any proposed fact taken from the parties' submissions were found by the Court not to have been established.

42

2007, Plaintiff Zanghi worked at FCA's Johnstown facility. *Id.* at 3. Had he worked through October 8, 2008, he would have accrued sufficient years and service under the FCA's Pension Plan to qualify for a Rule-of-65 pension. *Id.*

4. Named Plaintiff and subclass representative Robert A. Hayden, Jr. is a resident of Greensburg, Westmoreland County, Pennsylvania. Hayden Dec. (Document No. 15-3), ¶ 2. As of March 16, 2007, Plaintiff Hayden worked at FCA's Johnstown facility. *Id.* at ¶ 3. Had he worked through September 21, 2007, he would have accrued at least three years of service under the FCA Pension Plan. Plaintiffs' Ex. 21, p. 10. After accruing two more years of service on layoff, Hayden would have had at least five years of service under the FCA Pension Plan, which would have entitled him to receive a deferred vested pension upon reaching age 65. Hayden Dec. ¶ 3.

5. Plaintiffs assert that FCA laid them off...for the purpose of preventing them from becoming eligible for certain retirement benefits payable under plans established pursuant to the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA"). FAC at ¶ 1.

6. Plaintiffs proceed under section 510 of ERISA, codified at 29 U.S.C. § 1140, which in pertinent part provides that "[i]t shall be unlawful for any person to discharge,...suspend... or discriminate against a participant... for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an ERISA] plan." FAC ¶ 45.

7. Plaintiffs ask the Court to enter an injunction "requiring [that] FCA...allow them to continue to work and accrue necessary service in order to gain eligibility for benefits under the applicable ERISA plans." FAC at Prayer for Relief , c.

8. The Court held a hearing on this matter that commenced on October 3, 2007 and concluded on October 12, 2007. *See* HT, HT II.

## 2. The Defendant

9. FCA is the leading manufacturer of aluminum-bodied rail cars in North America, based on the number of cars delivered. Karan Dec. (Document No. 24-2 through 24-9) at ¶ 2.

10. FCA specializes in the production of coal-carrying rail cars, and manufactured an estimated 81% of the coal-carrying rail cars delivered in the North American market over the three years

43

ended December 31,2006. Karan Dec. at ¶ 3; HT at p. 163. FCA specializes in aluminum cars because of the added efficiency of aluminum cars in terms of weight capacity for the transportation of coal. HT at pp. 163-64.

11. FCA manufactures two primary types of coal-carrying rail cars, the BethGon series and the AutoFlood series. Karan Dec. at ¶ 4. The BethGon is an aluminum-bodied coal-carrying gondola rail car, which has become the most widely used coal-carrying rail car in North America, and which is emptied by rotating the car upside down to dump the coal out of the car. *Id.* at ¶ 4; HT at p. 164. The AutoFlood is a five-pocket aluminum open-top hopper coal-carrying rail car, equipped with a bottom discharge gate mechanism. *Id.* at ¶ 4; HT at p. 164. FCA also produces other types of aluminum-bodied and steel-bodied rail cars, refurbishes and rebuilds rail cars, and sells forged, cast, and fabricated parts for rail cars produced by FCA and other manufacturers. Karan Dec. at ¶ 5.

12. FCA's primary customers are financial institutions that lease cars to end users, railroads, and utilities. Karan Dec. at ¶ 6.

13. The current FCA has its beginnings in 1901, and was owned and operated by Bethlehem Steel Corporation from 1923 to 1991, as the Bethlehem Steel FreightCar Division. Karan Dec. at ¶ 7. In 1991, FCA's predecessor purchased the Bethlehem Steel FreightCar Division from Bethlehem Steel and became publicly owned in 1994. *Id.* at ¶ 8; Jordan Dec. (Document No. 24-10) at ¶ 3. The business was subsequently sold to certain members of management, and the Company became known as JAC Holdings International, Inc. Karan Dec. at ¶ 8. In December 2004, the Company changed its name to FreightCar America, Inc., to better reflect its business of manufacturing rail cars. *Id.* at ¶ 9.

14. FCA's manufacturing facilities are located in Danville, Illinois, Johnstown, Pennsylvania, and Roanoke, Virginia. Karan Dec. at ¶ 11.

15. As of December 31,2006, FCA had 1,429 employees, of whom 841 were members of unions, representing approximately 59% of the total labor force. Howard Dec. at ¶ 9; Karan Dec. at ¶ 26.

16. The production employees at the Danville facility are represented by the United Automobile, Aerospace & Agricultural Implement Workers Union of America (hereinafter "UAW"), Local 2419. Jordan Dec. at ¶ 11. The collective bargaining agreement with the UAW became effective in 2003 and expires November 1, 2008. *Id.*

44

17.  The production employees at the Roanoke facility are represented by the Transportation Communication International Union, Brotherhood Railway Carmen Division (hereinafter "TCIU"). The collective bargaining agreement with the TCIU expires on February 1,2011. Wyss Dec. (Document No. 24-16) at ¶ 11.

18.  On April 22, 2005, FCA completed an Initial Public Offering (hereinafter "IPO") and is now listed on the NASDAQ exchange. Karan Dec. at ¶ 10. FCA's sales for the year ending December 31, 2006 were $1,444.8 million. Plaintiffs' Ex. 27, p. 29. This represents an increase in sales of $517.6 million over the previous year, when the Company's sales totaled $927.2 million. *Id.* FCA's gross profits were $233.5 million for 2006 and $106.5 million for 2005. *Id.* Net income was $128.7 million for 2006 and 45.7 million for 2005. *Id.* at 30.

19.  FCA commenced operations at the Roanoke facility in January 2005. Karan Dec. ¶ 19. FCA added a second manufacturing track in Roanoke in February 2007. Wyss Dec. at ¶ 12.

20.  John Carroll (hereinafter "Carroll") served as both President and Chief Executive Officer of FCA through April 30, 2007. *See* FCA October 31, 2006 Form 8-K (Defendant's Ex. 6) at p. 2.

21.  Glen Karan (hereinafter "Karan") has been FCA's Vice President of Planning and Administration since November 2004. Karan Dec. at ¶ 1. From December 1999 through November 2004, Karan was FCA's Vice President of Finance, Treasurer and Secretary. *Id.* From 1994 through 1999, he served as the Company's Controller. *Id.*

22.  Mark Saylor (hereinafter "Saylor") has been FCA's Vice President of Operations for the past ten years. Saylor Dec. (Document No. 24-17) at ¶ 1. Saylor has been employed at FCA's Johnstown facility for the past 27 years. *Id.*

23.  FCA's Second Amended and Restated By-Laws set forth the powers and duties of the Company's CEO:

The Chief Executive Officer shall have responsibility for the management of the Corporation, including the general supervision and control of all the business and affairs of the Corporation, subject to the direction and control of the Board of Directors, and shall have such other powers and duties as may be assigned to him or her from time to time by the Board of Directors. The [CEO] shall participate in lang range planning for the Corporation....[and] shall perform other duties commonly incident to this office and shall also perform such other duties and have such

45

other powers as the Board of Directors shall designate from time to time.

Plaintiffs' Ex. 31, § 5.4.

24. The By-Laws also enumerate the powers and authority of the FCA President, which generally are to be set by the CEO and also include all other duties commonly incident to that office. Plaintiffs' Ex. 31, § 5.5.

25. Under the By-Laws, the powers and duties of FCA vice presidents are established by the Company's CEO or President. Plaintiffs' Ex. 31, § 5.6.

26. The North American rail car market is a highly cyclical industry. Karan Dec. at ¶ 21; HT at 64, 93; Anderson Dec. (Document No. 6-4) at ¶ 46. Rail car production and freight car production in the United States has ranged from about 100,000 cars in 1980 to about 5,000 cars in 1983. HT at 164. The industry is extremely volatile with cycles occurring every four to six years. *Id.*

27. FCA operates in a highly competitive marketplace and competes directly with the four other principal manufacturers in the North American rail car market: Trinity Industries; National Steel Car Limited; The Greenbrier Companies, Inc.; and American Railcar Industries. Karan Dec. at ¶ 22.

28. Adding to this competitive environment, over the past decade, there has been a consolidation of the railroad carriers, which are historically large purchasers of rail cars, operating in North America. Karan Dec. at ¶ 25.

29. FCA maintains a quarterly report based on data reported to the Railway Supply Institute, which compares FCA orders, deliveries, backlog, orders year to date, and deliveries year to date, to industry totals. Karan Dec. at ¶ 24, Ex. 1.

30. In the first part of the 1990s, after FCA had been purchased from the Bethlehem Steel FreightCar Division in 1991, all rail car production and repair was done at the Franklin and Shell Plants in Johnstown, Pennsylvania. Karan Dec. at ¶ 14. FCA's Franklin Plant, located in Johnstown (hereinafter "Johnstown facility"), is FCA's oldest manufacturing facility as it commenced operations in November 1901. Karan Dec. at ¶ 13. FCA also leased from Bethlehem Steel Corp. a temporary manufacturing facility in the Johnstown area, which was called the Mag Shed, to handle increased production that could not be built in the Franklin and

46

Shell plants. *Id.* at ¶ 14.*;* Jordan Dec. at ¶ 5.

31. The rail car market peaked for the Company in 1993 and 1994, and the Company had a backlog of nearly 7,000 rail car orders at the end of each year. Karan Dec. at ¶ 24, Ex. 1. For 1993-1995, the Company delivered more than 8,000 rail cars each year. Consistent with these production levels, in 1995, the Company purchased the Danville, Illinois plant and operated it as Freight Car Services. Jordan Dec. at ¶ 6. At about the same time, in 1995, the Company closed the leased Mag Shed temporary facility and moved production from that shop to Danville. *Id.* at ¶ 6. Deliveries of FCA rail cars declined over the next few years, falling to 3,374 in 1996 and 3,977 in 1997. Karan Dec. at ¶ 24, Ex. 1.

32. After 1997, the rail car market rebounded. During the 1998-2002 business cycle, industry-wide rail car deliveries...peaked at 75,704 in 1998, before falling to a low of 17,736 rail cars in 2002. Karan Dec. at ¶ 23. During this period FCA's rail car production at its three facilities – the Danville facility and the Franklin and Shell plants in Johnstown – declined from approximately 9,000 in 1998 to 4,067 rail cars in 2002. *Id.* at ¶¶ 14, 23; Jordan Dec. at ¶ 6.

33. After a profitable 2001, FCA suffered significant losses from 2002 through 2004, including a $24.9 million loss in 2004. Karan Dec. at ¶ 15. The downturn in the industry caused employment levels at Johnstown to drop significantly at the end of 2001. HT at p. 64. In 2002, FCA discontinued rail car production at the Shell Plant in Johnstown, due to manufacturing capacity in excess of market demand. Saylor Dec. at ¶ 2. The Shell Plant was subsequently sold to United Industrial Electro-Mechanical Services, Inc., a designer and manufacturer of aluminum, carbon steel, and stainless steel products. *Id.*

34. The cyclical nature of the rail car industry has continued in the current business cycle. Karan Dec. at ¶ 23. As production demand increased, FCA was able to return employees to work in 2003, and by 2004 there were no employees furloughed from the Johnstown facility. HT at p. 64.

35. With the recovery of the rail car industry, in 2005 rail car orders increased significantly, due in part to aging fleets and an upswing in coal, grain and steel shipments. Karan Dec. at ¶ 16. For 2005 and 2006, industry-wide rail car deliveries grew to 68,612 and 74,729, respectively, and FCA's rail car production increased to 13,031 and 18,764 rail cars, respectively. Karan Dec. at ¶ 45.

36. As production demand grew, FCA and Norfolk Southern entered into discussions under which FCA would produce coal cars for Norfolk Southern in Roanoke, Virginia, and the price per car

47

would be determined based upon the production costs plus a predetermined profit margin (*i.e.* a "cost plus arrangement"). Karan Dec. at ¶ 17. Norfolk Southern operates a railroad system that primarily serves the eastern markets in the United States, and is a very good and longstanding customer of FCA. HT II at p. 77.

37. Norfolk Southern had manufactured rail cars in the past, but had closed its East End Shops facility in Roanoke, where it built and overhauled cars and locomotives for coal service in the eastern United States. Karan Dec. at ¶ 18; HT II at pp. 77-78. Norfolk Southern and FCA discussed the benefits of having FCA produce coal cars for Norfolk Southern at this facility. HT II at pp. 77-78; Karan Dec. at ¶ 18. Subsequently, in December 2004, FCA and Norfolk Southern entered into a 10-year lease for the Roanoke facility. Karan Dec. at ¶ 18; HT II at p. 79.

38. Virginia and the City of Roanoke provided in excess of $200,000.00 in incentives to FCA, and under the terms of the lease, certain capital improvements made by FCA are reimbursed by Norfolk Southern in terms of reduced lease payments. Karan Dec. at ¶ 18; HT II at pp. 77-78.

39. The most attractive feature of operating the Roanoke facility to FCA was the fact that if FCA built cars for Norfolk Southern, FCA would do so on a cost plus arrangement. HT II at pp. 79-80. Norfolk Southern was interested in FCA producing certain hybrid coal cars that had not previously been produced. *Id.* at p. 80. Ordinarily, FCA would lose money on the production of a new product, but under this cost plus arrangement FCA was guaranteed to make a profit. *Id.* at p. 80. However, to obtain this arrangement, the cars must be built in Roanoke. *Id.*

40. FCA commenced operations at the Roanoke facility in January 2005, and delivered the first rail car manufactured at the Roanoke facility during the second quarter of 2005. Karan Dec. at ¶ 19; HT II at p. 79.

41. In 2006, the Roanoke facility was building AutoFlood coal cars, at which time FCA received an order from Norfolk Southern to build a prototype hybrid stainless steel/aluminum coal-carrying rail car, followed by the production of a large number of cars based on the prototype design. HT II at p. 81; Karan Dec. at ¶ 20. Because FCA did not have an exclusive contract and Norfolk Southern wanted these cars to be built in a certain timeframe, FCA could not delay production of the Norfolk Southern order until the AutoFlood order then in production in Roanoke was completed. HT II at p. 82.

42. Norfolk Southern provided FCA an additional track at the Roanoke facility where it could undertake the production of the Norfolk Southern order for hybrid stainless steel/aluminum

48

coal-carrying rail cars. Karan Dec. at ¶ 20; HT II at p. 81. In order to operate this second track, FCA reduced the production on the first track from 30 to 15 rail cars per day, and moved the entire second shift of employees to the second track where the cars were produced for Norfolk Southern at a rate of six cars per day. HT II at pp. 81-82.

43. Prior to the second track at Roanoke becoming operational, the production rate for the first track at Roanoke was 30 cars per day. HT II at p. 82. The employment level for production employees at the Roanoke facility fell from 425 as of December 31,2006, to 214 as of June 30,2007, a decrease of 222 employees. HT II at pp. 83-84; Defendant's. Ex. 28.

44. To date, the second track at Roanoke has manufactured the hybrid car exclusively for Norfolk Southern. Karan Dec. at ¶ 20.

### 3. FCA's Johnstown Facility, Its Production Employees and The Applicable Benefit Plans

45. The Johnstown facility's bargaining unit employees are represented by the United Steelworkers (hereinafter "USW" or "Union"). Karan Dec. at ¶ 27.

46. In November 2004, the USW ratified a new Collective Bargaining Agreement (hereinafter "CBA" or "Agreement"), which became effective on February 25, 2005, and expires on May 15, 2008. Karan Dec. at ¶ 28.

47. Pension eligibility requirements for Johnstown facility employees are set forth in section 2 of the Johnstown America Corporation Bargaining Unit Pension Plan (hereinafter "FCA Pension Plan" or "FCA Plan"). Howard Dec. at ¶ 2.

48. The FCA Plan provides for and defines "Normal Retirement" as follows:

Any participant who shall have reached the fifth anniversary of the date on which he became a Participant in this Plan (or the Former Parent's Plan, if earlier) and shall have attained the age of 65 years shall be eligible to retire, and shall upon his retirement (hereinafter "normal retirement") be eligible for a pension. The Participant's right to his or her Accrued Benefit shall be nonforfeitable upon attaining age 65 and reaching such fifth anniversary.

Plaintiffs' Ex. 26 at p. 6.

49.   The FCA Plan also sets forth several other retirement formulae under which employees may retire and be eligible for regular retirement benefits. Plan participants are eligible to retire and receive their regular, unreduced pension if they (1) are at least 62 and have at least 15 years of continuous service ("62/15 Retirement"); (2) are not yet 62 but have at least 30 years of continuous service ("30-Year Retirement"); or (3) are at least 60 and have at least 15 but less than 30 years of continuous service ("60/15 Retirement"). Plaintiffs' Ex. 26 at p. 6.

50.   The FCA Plan provides for and defines "Rule-of-65 Retirement" as follows:

Any Participant (i) who shall have had at least 20 years of Continuous Service as of his last day worked, (ii) and who has not attained the age of 55 years, and (iii) whose combined age and years of Continuous Service shall equal 65 or more but less than 80, and

(a) whose Continuous Service is broken by reason of a layoff or disability, or

(b) whose Continuous Service is not broken and who is absent from work by reason of a layoff resulting from his election to be placed on layoff status pursuant to the provisions of the Basic Agreement applicable in the event of a permanent shutdown, and who has not been offered suitable long-term employment, as defined below, shall be eligible to retire and shall upon his retirement (hereinafter "rule-of-65 retirement") be eligible for a pension.

Plaintiffs' Ex. 26 at pp. 7-8.

51.   The FCA Plan provides for and defines "70/80 Retirement" as follows:

Any Participant who has not attained the age of 62 years and who shall have had at least 15 years of Continuous Service and (i) who shall have attained the age of 55 years and whose combined age and years of Continuous Service shall equal 70 or more, or (ii) whose combined age and years of Continuous Service shall equal 80 or more, and:

(a) whose Continuous Service is broken by reason of *a permanent shutdown of a plant, department or subdivision thereof,* or by reason of a layoff or physical disability; or

50

(b) whose Continuous Service is not broken and who is absent from work by reason of a layoff resulting from his election to be placed on layoff status as a result of a permanent shutdown of a plant, department or subdivision thereof; or

(c) whose Continuous service is not broken, but who while on layoff resulting from his election to be placed on layoff status pursuant to the provisions of the Basic Agreement as a result of a permanent shutdown of a plant, department or subdivision thereof, accepts a position with the Employer and, prior to the expiration of 90 consecutive calendar days from the first day worked in such position, elects to retire, shall be eligible to retire, and shall upon his retirement (hereinafter "70/80 retirement") be eligible for a pension.

Plaintiffs' Ex. 26 at p. 7(emphasis added).

52. "Continuous Service" as the term is understood for purposes of the FCA Plan includes a furlough of up to and including two years, but with a furlough the length of two years and one day, continuous service ends. Howard Declaration, Exhibit 1, at p. 17. Continuous Service, including the two years of furlough, can "be broken by: (1) quit; (2) discharge,...(3) termination of employment due to permanent shutdown of a plant, department or subdivision thereof...." *Id.* Therefore, any employee accruing continuous service during a furlough that is two years or less would cease such continual accrual upon a permanent shutdown of the Johnstown facility during such a furlough.

53. Employees eligible for a Rule-of-65 or a 70/80 special pension receive full pension benefits without actuarial reduction, as well as $400 per month supplement until age 62. HT II at p. 98. Employees eligible for special pensions are also eligible for company-paid health benefits for themselves and their families. *Id.*

54. Employees who have a break in service, such as a layoff, continue to accrue service credit towards a pension for up to two years thereafter. HT at pp. 174-175. If a plant shuts down before employees have reached 20 years of service, those employee are ineligible for their Rule-of-65 pensions, as employees shall have had at least 20 years of Continuous Service as of his last day worked in order to receive Rule-of-65 pensions. HT II at p. 119; Plaintiffs' Ex. 26, pp. 7-8.

55. To satisfy the 20-year service requirement for a Rule-of-65 pension, an employee must actually work at least one day after he attains twenty years of service. HT II at pp. 174-175. Plaintiffs' Ex. 26 at pp. 7-8. In contrast, the 15-year service requirement for a 70/80 pension can be met by using up to two years of service credit that have accrued after layoff. *Id.*

56. Rule-of-65 and 70/80 pensions are available in the event of a break-in-service, such as a layoff, of two years. Employees eligible for a 70/80 pension can begin collecting benefits immediately if there is a plant shutdown. Plaintiffs' Ex. 26 at p. 7; Howard Dec. Ex. 1 at p. 11.

57. FCA Plan participants not eligible to receive any other pension who have at least five years of continuous service at a time when their continuous service is broken are eligible to receive a deferred vested pension at age 65. HT II at p. 46. Because Plan participants continue to accrue service toward a deferred vested pension for two years after layoff, Plan participants who have at least three years of continuous service as of the date of their layoff may attain the required five years of service through post-layoff service accrual. *Id.*

58. Between 1987 and 1989, the Company hired an unusually large number of employees. HT II at p. 100. These employees would begin to reach 20 years service, and eligibility for Rule-of-65 pensions, beginning on December 22, 2007 and continuing through April 1, 2009. Declaration of Tom Vatavuk ("Vatavuk Dec.")(Document No. 56), ¶¶ 12-13 & Exhibit A at pp. 1-7. During this fifteen and one-half month period, approximately 100 individuals (including four who have resigned since layoff) would reach the 20-year milestone. *Id.*

59. Between August 16, 2004 and October 11, 2004, the Company hired 82 employees. Vatavuk Dec. ¶¶ 6-7, & Exhibit A at pp. 8-10. These employees would begin to reach three years of service, and would therefore be able to accrue eligibility after layoff for deferred vested pensions, between August 16, 2007 and October 11, 2007. Vatavuk Dec. ¶¶ 6-7 & Exhibit A, pp. 8-10; HT II at pp. 45-46.

60. In 2001, the rail car industry was in a state of decline. A number of rail car plants had closed. HT II at pp. 235-236. Employment at the Johnstown plant was reduced to 40 from a high of nearly 800 in 1999. *Id.* Company officials notified the Union that they believed that the industry was in a state of permanent decline. *Id.*

61. The USW staff representative responsible for FCA's Johnstown facility, Raymond Jastrzab (hereinafter "Jastrzab") met with FCA President Carroll for the first time during 2001. HT at pp. 32-33, 38-40.

62. In describing Carroll's statements at their meeting, Jastrzab testified as follows: "And during the course of that conversation he said that he had, he had to have the elimination of the Rule-of-65 and 70/80 pensions. That was going to be one of the top demands that he was going to make during contract negotiations." HT at p. 39.

52

63.   On January 21, 2002, after declaring an impasse in bargaining, FCA unilaterally implemented its final proposal to the USW, which included the elimination of the Rule-of-65 and 70/80 pensions and the $400 supplement. *See* July 1, 2002 letter from Company attorney Joseph McDermott to USW counsel Angela Pace (Plaintiffs' Exhibit 18). On May 8, 2002 FCA amended the pension plan to eliminate special pensions. *Id.*

64.   A 2003 National Labor Relations Board administrative law judge ("ALJ") ruling recounts the FCA's efforts to eliminate special pensions, also termed shutdown pensions, and the benefits associated with them. *See In re Johnstown America Corp.* 2003 WL 1831898 (April 4, 2003)(Plaintiffs' Exhibit 17). The ALJ concluded that in 2002, FCA violated Section 8(a)(5) of the National Labor Relations Act when "even though [it] could not lawfully abolish accrued [Rule-of-65 and 70/80 ] pension benefits, it insisted to impasse on its proposal to allow it to do exactly that." *Id.* at 35, 42. In addition, the Company violated the Act by "unilaterally implementing changes in the unit employees' terms and conditions of employment in the areas of employees Rule-of-65 and 70/80 pensions," specifically by "unilaterally eliminating the $400 supplement and the health and life insurance benefits of employees retiring under the Rule-of-65 and 70/80 pensions." *Id.* at 40, 41.

## 4.   FCA's concern for costs and special pensions at the Johnstown Facility and the mid-term CBA negotiations with the USW

65.   In 2005 shortly after the commencement of the CBA, FCA officials had become concerned that the costs at Johnstown made that facility uncompetitive. Saylor Dec. at ¶ 13. Total hourly labor costs (including hourly wages, payroll taxes, insurance, and fringe benefits, but excluding 401K/pension costs) at Johnstown are 61% higher than at Danville, and 104% higher than at Roanoke, which results from higher labor costs and increased inefficiencies resulting from paid lunch, paid wash-up time, and longer paid breaks at Johnstown. Karan Dec. at ¶ 51. These costs, in turn, make it much more costly to manufacture rail cars in Johnstown. Rail cars sell for approximately $75,000.00. Karan Dec. at ¶ 52. Collectively, the labor costs and inefficiencies at the Johnstown facility add an average of $3,000.00 to the per rail car manufacturing costs, as compared to the cars manufactured at FCA's other facilities. Karan Dec. at ¶ 52; HT II at p. 61.

66.   In the first half of 2005, Carroll asked to meet informally with the USW leadership to encourage the USW to come to the bargaining table with the intent of reducing the Johnstown "cost structure," which was "too high" to be competitive. HT II at p. 50.

53

67. In July 2005, Carroll, Karan, and Saylor met with USW officials Jastrzab, Jeff Anderson (hereinafter "Anderson")[7], Dennis Conahan (hereinafter "Conahan"), Jim Vogel and Tom Strushensky, HT at pp. 47-48, and Jastrzab took contemporaneous, nearly verbatim notes during this meeting. *Id.* at p. 48. The meeting was held because Carroll wanted it. HT at p. 47. Carroll expressed his frustration that the USW refused to permit contracting out of rail car orders from the Johnstown facility, and explained that, because the costs at Johnstown were significantly higher than at FCA's other production facilities in Danville and Roanoke, that FCA was going to assign work to the lower cost facilities and when the anticipated industry downturn came and rail car orders decreased, Johnstown employees would necessarily be laid off. HT II at 50-51; Saylor Dec. at ¶ 14. Also during this meeting, Carroll made it known to the USW that, because Roanoke and Danville had successfully operated at significantly lower cost, FCA was looking for similar opportunities, and hoped that the Johnstown facility could be operated more efficiently, but if that was not possible, the Company would explore opportunities to open other facilities. Saylor Dec. at ¶ 15.

68. After questioning by the Court to Karan on the contents of Jastrzab's notes, Karan did not refute or object to the following comments by Carroll in July 2005 as written contemporaneously by Jastrzab:

J. Carroll wanted to address

group

[Carroll:]disappointed that we wouldn't

agree to previous proposal to

extend current understandings

in exchange for guaranteed

employment extension

Finally figured out Johnstown workers mentality.

Get a job and the Company owes you a living for the rest of your life

not that way in the real world

---

[7]Anderson is the president of the FCA unit of the USW Local 2635 while Conahan is USW Local 2635's President. USW Local 2635 is an amalgamated union, meaning that it represents units of workers at different employers, but the units are combined to create the Local 2635. Anderson Dec. (Document No. 6-4), at ¶ 5; Conahan Dec. (Document No. 6-6) at ¶ 5.

After you get laid off you should look for other work

There's a whole world out there-move to where work is.

JAC [FCA's former name] doesn't owe you a living.

Legacy costs and trailing benefits are costing JAC profits

Cannot take on anymore legacy costs.

Large group of employees will add to these legacy costs in year 2008.

Cannot let this happen

\*\*\*

Currently looking for a place to start up a new plant to build RR cars

Have shown that we can do it in Danville and Roanoke

Before 2008 we will start up a new facility

We will send orders to that facility and only keep employees with 20 or more years service working in Johnstown

Keeping them working will eliminate having to pay early pensions with a shutdown

\*\*\*

These employees [that are approaching 20 years of service] will never reach the 20 year mark under current pension language

Karan-we are actively looking for a new facility to start up

This is not a threat.

It is a confirmed strategy

part of business plan moving forward.

JC [Carroll]- no need for notes.

This meeting is not a negotiation session.

Just want you to know where we are going here

and what we plan on

doing in the future

\*\*\*

RJ [Jastrzab]-is there anyway

that we can encourage the company to stay in Johnstown?

JC [Carroll]- we are going to stay

smaller workforce

20 plus years of service

55

Mark Saylor- we will keep

guys working on smaller

orders or odd ball jobs

GK [Karan]- Union still has time to

negotiate something on legacy

costs.

RJ[Jastrzab]- Maybe will [sic] can sit down and discuss possibilities.

How about the SWPT [Steelworker Pension Trust]?

Can we do something here?

GK[Karan]-[Karan according to his testimony objects to Jastrzab's notes here but confirms that he objected to the Steelworker Pension Trust.]....

[Matters that Karan objected to in his testimony, as well as a concluding discussion about contracting work outside of Johnstown, have been excluded from this quote.]

69. The ability to contract certain work out would give FCA greater flexibility to build new products. For example, the Company noted in mid-term negotiations with the USW that contracting out at the Kasgro facility would have permitted FCA to build cars that will allow FCA to get into new products at a lower cost. Defendant's. Ex. 16.

70. Since that meeting, however, FCA has not opened any new manufacturing facilities. Saylor Dec. at ¶ 13.

71. During the informal July 2005 meeting, FCA representatives urged the USW to consider necessary cuts in labor costs because, without such cuts, the Johnstown facility could not continue to operate. Saylor Dec. at ¶ 16. Specifically, FCA sought to bring operation costs into line with the Danville and Roanoke facilities. *Id.* As a result of this meeting, the parties agreed to negotiate and consider what could be done to bring down the costs in the Johnstown facility. *Id.*

72. According to Plaintiffs, Carroll made it clear that FCA would not allow employees at Johnstown to reach 20 years of service. FCA officials, on the other hand, testified that Carroll was trying to impart the importance of cutting costs at the Johnstown facility. Carroll was very disappointed that the USW rejected FCA's request to agree to build cars at Kasgro and wanted to get the Union back to the bargaining table. HT at pp. 76-77; HT II at p. 50; Saylor Dec. at ¶¶

56

14-16. Further, although Jasztrab testified that the meeting was not about the high labor costs at Johnstown (Hearing Tr. II at p. 244), Anderson, also of the USW, agreed that it was:

> John Carroll called all the officers of the unit to explain the company's position since we turned down the Kasgro agreement extension. . . . John [Carroll] come [sic] in, sit [sic] down, expounded on his disappointment that we didn't extend the contracting out, Kasgro agreement. **He said that the costs at Johnstown were high. He said that in 2008 a group of employees . . . would be eligible for the special pensions, and that was not going to happen.** He needed relief in other areas.

HT II at pp. 76-77 (emphasis added).

73. Jasztrab's notes of the July 21, 2005 meeting confirm that Carroll opened the meeting by explaining that he was disappointed that the USW would not agree to extend the agreement to build cars at Kasgro in exchange for guaranteed employment at Johnstown. Plaintiffs' Ex. 29.

74. Carroll indicated that, if the USW could not take the necessary steps to cut costs, the work would be assigned to the more cost effective facilities – a business reality that was repeated again and again to the USW throughout mid-term negotiations – and, unless addressed, in the next cycle, the resulting unavoidable layoffs at Johnstown would cause these employees not to become eligible for their special pensions. HT II at pp. 218-219; *see also* HT at pp. 53-54; HT II at pp. 54-63 Defendant's Exs. 16, 17, 18, 20, 26; Karan Dec. at ¶¶ 39-41.

75. At the same July 2005 meeting with Carroll, Karan told Union officials that Carroll's comments were not a threat, but the Defendant's business plan. HT at p. 50.

76. Jastrzab offered the idea of participating in the Steelworker Pension Trust, but Karan objected to it. HT II at p. 220.

77. Karan disagreed with some portions of Jastrzab's notes of the July 21, 2005 meeting, but did agree that the Defendant would be assigning work to facilities other than Johnstown because those facilities do not have as much cost as Johnstown and **that those approaching twenty years of service with the Defendant would not reach their twentieth year.** Karan did review the entirety of Jastrzab's notes and noted other portions from Plaintiffs' Exhibit 29, that he disagreed with, and others he agreed with the notes as written. HT II at pp. 217-220 (emphasis added).

78. The parties agreed to meet, and mid-term negotiations commenced on November 2,2005. HT at p. 53; HT II at p. 51; Defendant's Ex. 16; Karan Dec. at ¶ 39. According to Jasztrab, FCA wanted $15.00 per hour in concessions to make the Johnstown facility more competitive, and both FCA and the USW wanted to engage in midterm negotiations to keep the Johnstown facility open. HT at pp. 53-54.

79. During the November 2, 2005 meeting, Karan, FCA's Vice President of Planning and Administration, informed the USW officials present that, during this period of higher demand for production, FCA intended to manufacture rail cars at the Kasgro facility in New Castle, Pennsylvania, beginning in April 2006, consistent with the provision under the CBA that the Kasgro facility be operated as a bona fide FCA manufacturing facility. HT II at p. 54; Defendant's. Ex. 16; *Karan Dec.* at ¶ 39. FCA also intended to continue operations at the Johnstown facility as long as it remained competitive with other facilities. Karan Dec. at ¶ 39. Because FCA's plan and desire was to keep the Johnstown facility in operation, Karan asked the USW to redirect its attention from the special pensions...and to focus on the cost reductions necessary to keep the Johnstown facility open. *Id.*; HT II at p. 54. Karan stressed that, because special pensions only become effective if the facility is shutdown or there is a layoff of more than two years, special pensions are only a cost to the Company in the event of a plant shutdown or two-year layoff. HT II at p. 54. However, without necessary cost reductions, FCA was concerned that it could not keep the Johnstown facility open when orders slowed, a result of which would mean that employees short of 20 years service would not accumulate service credit which would enable them to become eligible for the special pensions. Karan Dec. at ¶ 39.

80. The necessary cost reductions addressed by the Company at the November 2, 2005 meeting included health care, a move away from a defined benefit pension plan to a defined contribution (401 k) plans, contracting out, and the need to reduce the number of man hours required at Johnstown to build rail cars. HT II at p. 55.

81. Following the initial bargaining session between FCA and the USW, Karan sent a letter to Jastrzab, to reiterate the need for cost reductions at the Johnstown facility. HT II at p. 55; Defendant's Ex. 17. In response to the USW's request for an itemization of what the [USW] could do to save jobs, Karan responded: "Where cost savings could be made include: co-payments on employee and dependent health care premiums, replace future defined benefit pension service with a defined contribution (401k) plan, allow contracting out on specific parts, change paid breaks to non-paid breaks, adjust work rules to allow management to schedule work for more efficient production, and **freeze service** on special pensions and retiree health. We would welcome any additional ideas the Union might have." Defendant's Ex. 17 (emphasis added). Karan also outlined the parties' respective positions on establishing operations at the Kasgro facility in New Castle, Pennsylvania, but stressed that FCA wanted to continue operations in Johnstown as long as those operations could be competitive, adding that "we

58

intend to do everything we can to keep employees working as long as we can." HT II at 55; Defendant's Ex. 17.

82. FCA and USW representatives met again on November 18,2005, during which Karan explained that, excluding so-called legacy costs such as special pensions, Johnstown's labor rates exceeded Danville's by roughly $15.00 per hour. HT II at pp. 56-58; Defendant's Ex. 18; Karan Dec. at ¶ 40. The USW indicated that it would address the costs by looking at the possibility of employee co-pays on health care premiums and wanted the Company to consider the Steelworker Pension Trust, as opposed to a 401 k plan. Karan Dec. at ¶ 40. The USW insisted, that the Company guarantee work for all current employees through the end of the CBA in exchange for any concessions. *Id.*

83. Sometime in November 2005 during the period of "concessionary talks", Saylor saw Anderson in the plant and called him into his office for an informal meeting to discuss the special pensions and how they worked. HT at pp. 79-80. The two men reviewed a seniority list of the Union members and a conversation ensued between the two wherein Saylor expressed his belief that individuals working for FCA did not understand these pensions and in fact many Union members had already qualified for the service and age requirements for their pensions, specifically the 70/80 pensions. *Id.*

84. FCA and USW representatives met again on December 8,2005, and Karan opened the meeting by stressing that it was imperative that the USW take steps to bring costs in line in order to save jobs at the Johnstown facility. Karan Dec. at ¶ 41. FCA provided and reviewed with the USW an extensive cost comparison among the three facilities with the expectation that the [USW] would submit a meaningful proposal that would reduce costs and save jobs. Karan Dec. at ¶ 41; *see also* HT II at pp. 58-59; Defendant's Ex. 18. Karan explained that the cost comparison showed, *without regard to special pensions or even... current retiree costs,* that the labor and benefit rate for Johnstown was significantly greater than at Danville at Roanoke. HT II at p. 60. Although the USW continued to insist upon guaranteed employment, FCA officials reminded the USW that if the USW agreed to meaningful cost reductions, more work would naturally flow to Johnstown. Karan Dec. at ¶ 4. *see also* HT II at p. 60; Defendant's Ex. 18. Finally, FCA officials explained that, while FCA would like to have the Johnstown costs as low as the costs at other facilities, **the Company understood that such a drastic reduction was not likely at this time,** but stressed that meaningful reductions were still necessary. Karan Dec. at ¶ 41 (emphasis added).

85. Karan explained that, the increased costs at Johnstown have a significant impact on FCA's bottom line. HT II at p. 60. If both tracks at Johnstown could be run continuously, with an anticipated production output of 5,000 rail cars per year, the cost to produce those 5,000 rail

59

cars at Johnstown would exceed the cost to produce the same 5,000 rail cars at FCA's other production facilities by $15 million per year. *Id.* at pp. 60-61.

86.    Instead of providing a proposal to reduce costs and save jobs, the USW demanded, among other things, that all current bargaining unit employees be guaranteed 40 hours pay per week and that the Company could not lay off these employees through the end of the CBA. Karan Dec. at ¶ 42. *See also* HT II at pp. 61-62. In discussions pertaining to the Union's demand for guaranteed employment at a meeting held on December 22,2005, FCA officials expressed their disappointment and reiterated that the Company would assign future work depending upon capacity, economic demand, and the costs at the Johnstown facility relative to other facilities. Karan Dec. at ¶ 42. *See also* HT II at p. 62. The effect on Johnstown of considering the costs at each facility is obvious, but was nevertheless explained to the Union–as the market demand decreases there is less work that's going to be built by the different facilities and Johnstown costs being on average $20 an hour higher, they would not get the work in a declining market and, therefore, the employees would be laid off. HT II at p. 63.

87.    On December 15, 2005, a second informal meeting occurred between Saylor, Anderson and Jastrzab at Jastrzab's office where special pensions, possible changes to work rules, bonuses and other costs and benefits to FCA were discussed. HT at pp. 58-62, 80-81. Plaintiff's Exhibit 30. Special pensions were among the items that Saylor discussed with the two men and indicated that the various costs to FCA needed to be reduced and the Union should concede certain benefits. HT at pp. 61-62. Saylor reiterated the saving that FCA could obtain by shutting down the Johnstown plant, opening a new plant and pay pensions to those who have attained pension eligibility upon the date of shutdown. HT at pp. 60-61.

88.    Jastrzab and Anderson took contemporaneous notes of the December 15, 2005 meeting. Plaintiffs' Exhibit 30; HT at p. 57; Plaintiffs' Exhibit 62; HT II at p. 237.

89.    Jastrzab's contemporaneous notes of the December 15, 2005 meeting reflect these statements of John Carroll as told to Saylor. Plaintiffs' Exhibit 30.

90    Jastrzab's notes of the December 15, 2005 meeting read in pertinent part:

special pension-
work rules-hours of work-washup time
Saylor said that John Carroll says:

**Doesn't want anyone else to become eligible for rule of 65 or 70/80 pensions**

Currently dollar amount is froze.

**John Carroll wants accrual to stop**

We cannot afford to operate beyond

2007 because **we can't let anyone**

**become eligible for Rule of 65-70/80**

Cost of these pensions are about the same as opening a new plant.

Cannot let people increase this cost.

Also must have work relief.

Plaintiff's Ex. 30 (emphasis added).

91.   Jeff Anderson also took contemporaneous notes of the December 15, 2005 meeting. HT II at p. 237. These notes record that Saylor stated, among other things that Johnstown "can't operate after 2007" and **"special pensions have to go away."** Plaintiffs' Ex. 62 (emphasis added).

92.   During another concessionary talks meeting on December 22, 2005, the parties also discussed special pensions, and both the FCA and USW representatives at this meeting agreed that the special pensions, such as Rule-of-65 and 70/80 pensions, do not cost the Company money except if there are layoffs. Karan Dec. at ¶ 42. See also HT at p. 99; HT II at 62; Defendant's Ex. 20.

93.   Meanwhile, as the market continued to perform well -- 2006 was "unprecedented" in terms of production -- FCA obtained significant orders for aggregate cars from TXI, AutoFloods from Cerrejon, and 62' flat bulkhead cars from BNSF. Karan Dec. at ¶ 34; HT II at p. 63. Because FCA had no employees on layoff and required additional production resources to build these additional rail cars, in order to support these orders and complete production in the 2006-2007 timeframe, FCA proposed to contract this work to Kasgro. Karan Dec. at ¶ 34. *See also* HT II at pp. 63-64; Defendant's Ex. 21. Because the CBA specifically precluded further contracting out to Kasgro, FCA and the USW entered into a supplemental agreement to permit FCA to subcontract the building of railroad freight cars to Kasgro from February 1, 2006 to May 15, 2008 provided that while subcontracting to Kasgro all of the active employees covered by the CBA who are active as of December 31, 2005 will be scheduled to work 40 hours per week. Karan Dec. at ¶ 34. *See also* Defendant's Ex. 21; HT II at p. 64.

94. The negotiations in 2005 ended in a stalemate in that FCA was not prepared to give a guarantee of work, while the USW wanted a guarantee of work before it considered any concessions. HT II at p. 68. Because the USW also had repeatedly raised questions about special pensions, FCA officials hoped to break the stalemate by offering a form of guarantee in providing all the employees some sort of elapsed time method to guarantee them an accrual into these special pensions whether they worked or not. HT II at p. 68. Karan met informally with Local 2635 Union President Conahan in the first half of 2006, and Conahan agreed to review the proposal with the USW's negotiating committee. *Id.*

95. The FCA and USW officials did not meet again until June 14, 2006. HT II at pp. 69-71; Defendant's Ex. 23; Karan Dec. at ¶ 43. In an effort to break the stalemate, FCA offered a simplified proposal whereby the USW would agree to reduce the hourly labor and benefit rate by $15.00 per hour, allow unrestricted contracting out, and agree to work a full eight-hour day (*i.e.*, eliminating unpaid lunches, breaks, and wash-up time). Karan Dec. at ¶ 43. *See also* HT II at p. 70; Defendant's Ex. 23. In return, FCA would agree to find a way to allow employees to accrue coverage for special pensions through May 15, 2008 (the expiration date of the CBA) in the event of a total plant shutdown. HT II at pp. 28,70; Defendant's Ex. 23; Karan Dec. at ¶ 43. In other words, in lieu of guaranteed work, FCA would provide accrued service credit for the life of the Agreement, thereby guaranteeing eligibility for the special pensions. *Id.*

96. This offer to guarantee eligibility for special pensions was repeated throughout the course of mid-term negotiations. HT II at p. 29. Human Resources Manager Charles Howard (hereinafter "Howard") also mentioned the possibility of lowering the required service years from 20 to 18, which would have ensured eligibility for special pensions for all employees hired in or around 1988. *Id.*

97. If the Union had agreed to FCA's offer to provide accrued service credit for the life of the CBA, 26 employees currently on layoff would have been guaranteed eligibility for special pensions. HT II at p. 28. Because the Union did not agree, these 26 employees will not become eligible for special pensions unless they are recalled within two years. *Id.*

98. The USW never followed up on the Company's offer to permit employees to continue to accrue service credit for special pensions, regardless of whether they were actively employed, and never followed up the possibility of reducing the required service years from 20 to 18. HT at pp. 83, 97.

99. During additional meetings and conversations in 2006, FCA continued to request that the USW agree to reduce the hourly labor and benefit rate by $15.00 per hour, allow unrestricted

contracting out, and agree to work a full eight-hour day, but the USW refused to agree without, among other things, a full guarantee of work of 40 hours per week for all employees through the end of the CBA. Karan Dec. at ¶ 43. *See also* HT II at pp. 32,71-72; Defendant's Ex. 24.

100. Throughout the mid-term negotiations, the Company never sought any concessions relating to special pensions; Anderson acknowledged that the concessions sought by FCA were "just [the] basic package without pensions." HT at p. 98.

101. During mid-term negotiations, the Union expressed concerns that despite the fact it may give concessions to FCA, FCA would operate the Johnstown facility for a limited amount of time, which would not allow certain employees to meet the minimum service time necessary to be eligible for special pensions, before permanently shutting down the facility. HT II, pp. 171-172.

102. In a last ditch effort to reach agreement, in December 2006, then-FCA President Carroll offered to the USW that he would consider a reduction of hourly labor and benefit costs of only $13.00 per hour, as long as the USW would agree to unrestricted contracting out and to eliminate the 20-minute paid wash-up period. Karan Dec. at ¶ 44. *See also* HT at p. 55. *See also HT II* at pp. 72-73; Defendant's Exs. 25, 27. In return, FCA was willing to consider a market based guarantee, such that the Johnstown facility would build 50 percent of certain orders up to 1000 rail cars, despite the excessive costs at Johnstown. HT II at p. 73. FCA also continued to offer to provide accrued service credit for the life of the Agreement, thereby ensuring eligibility for the special pensions. Karan Dec. at ¶ 44. However, USW officials refused to consider any concessions without a full guarantee of work, refused to offer more than a $10.04 reduction of hourly labor and benefit costs, refused to permit unrestricted contracting out, and rejected FCA's proposal to provide accrued service credit in lieu of a guarantee of work. *Id.*; Defendant's Ex. 27.

103. FCA and USW officials met again on January 16,2007. HT II at p. 73; Defendant's Ex. 26. FCA insisted on at least $13.00 per hour in concessions, to which the USW would not agree; and the USW continued to insist on employment guarantees greater than what FCA would offer. HT at pp. 54-55,68; HT II at pp. 74, 175; Defendant's Ex. 26. The USW insisted that the Company provide a more significant employment guarantee than the 1000 rail car guarantee offered by the Company in December 2005, but the Company would not increase this offer because, even if the USW agreed to the $13.00 concessions, the costs of building rail cars in Johnstown would still exceed the other facilities by a significant amount on a per hour basis. HT II at p. 74.

104. At the close of the January 16, 2007 meeting, FCA officials explained that the Company had moved as much as it can. Defendant's Ex. 26. In response to questions from USW officials as

63

to what would happen in the future, FCA officials said we live with the contract. Although, with the higher cost at Johnstown it is not likely we will have much work for Johnstown. We will place work at our lower cost facilities. We will continue to bid work for Johnstown, however, with the high cost rates of the facility it isn't likely we will receive much work. *Id.*

105. Although the mid-term negotiations were unsuccessful, both Jasztrab and Anderson conceded that the Company never even raised the issue of special pensions, except to offer to permit employees to accrue pension service through the expiration of the CBA, regardless of whether there was a plant shutdown or layoff in excess of two years. HT at pp. 67-69, 83, 97-98. According to Jasztrab, this offer by FCA would have allowed additional employees to become eligible for special pensions. *Id.* at p. 69. Nevertheless, the USW never expressed any interest in the continued accrual of service credit for special pensions, and never expressed any interest in the 18-year service requirement for the Rule of 65 pension. HT at pp. 83, 97; HT II at pp. 179, 184.

106. The desire was always to keep the Johnstown facility open, HT II at p. 74, but excessive costs at the Johnstown facility caused FCA to consider the possibility of closing that facility. As part of this analysis, since 1999-2000, FCA has, in its five-year projections, analyzed the costs of a reduction in force at Johnstown or shutting down the Johnstown facility. HT II at pp. 117-18. This is because anytime there is a reduction in force, necessary adjustments must be made to the Company's balance sheet. HT II at p. 124.

107. Tom Garabedian (hereinafter "Garabedian") is an employee of Hewitt Associates, an international actuarial and consulting firm for benefit services. HT II at pp. 65-66, 135.

108. The costs that would be incurred in the event of a plant shutdown include total pension costs, total health care costs, severance costs, any costs associated with and incurred through the result of effects bargaining, accrued vacations, and impairment of the facilities. HT II at p. 75. The budget and five-year plans prepared by FCA's finance department, which included the cost projections of a plant shutdown, require actuarial analysis to determine the continuing costs of pension and retiree health care benefits in the event of a plant shutdown. HT II at pp. 65-66, 75. Karan, who had a longstanding relationship with Garabedian of Hewitt Associates, was asked to obtain this information and provide it to the finance department. *Id.* at pp. 65-66.

109. An email message dated March 3, 2005 from Karan to Carroll, copied to five other individuals, is titled "Preliminary Pension Expense Estimates: 2006 RIF vs. 2008 RIF." Plaintiffs' Ex. 57. Karan explains that by delaying the reduction in force at Johnstown from 6/30/06 to 5/15/08 we will have a large negative impact on the Earnings Before Interest, Taxes Depreciation and

Amortization (hereinafter "EBIDTA") for the period from 2006 through 2009, inclusively. *Id.* Karan then provides a chart consisting of a summary of the impact on EBIDTA, and concludes that "In short, there is about a \$20 million cost of delaying **the** restructuring." *Id.*; HT II at p. 130 (emphasis added).

110. FCA produced a chart regarding active employees as of May 2, 2005 titled "**RIF** [i.e., "Reduction in Force"] **Analysis (Undertaken to determine additional legacy costs created by retaining employees).**" Plaintiffs' Ex. 14. (emphasis added). It states that "this chart assumes that the workforce remains the same as May 2, 2005 and **shows the additional employees that qualify for special or normal pensions by staying employed.**" *Id.* (emphasis added).

111. An email message dated May 9, 2005 from Karan to Garabedian states as follows:

> The issue we are having trouble with is: what does it cost the company to delay the RIF? **We are trying to equate the curtailment charge with the change in the number of employees that qualify for either special or regular pensions.** There is also a change in the annual expense related to the **additional qualifying employees.**
>
> **Is there a way to isolate the cost of the increased number of employees that qualify for special or normal retiree benefit costs because of delaying the RIF?**

Plaintiffs' Ex. 4 at p. D-2607(emphasis added).

112. Hewitt prepared a report, apparently in response to this request. Hewitt's report includes a series of charts that projected the optimum time for layoffs in order to prevent employees from vesting in their special pensions and associated benefits. *See* Plaintiffs' Ex. 5. The report also includes an explanation of Rule-of-65 and other pensions. *Id.* at p. D-2553. Handwritten notes on the report...state "RIF means going from 509 to 120 (those eligible for special pensions on 6/30/06)." *Id.* at D-2555. Other notes in the same handwriting state elsewhere on the report that "JC [John Carroll] offered to meet w/ USWA crowd on 7/21/05." *Id.* at p. D-2548.

113. The actuarial analysis obtained from Hewitt Associates includes both a FAS 87 calculation and a FAS 106 calculation. The FAS 87 calculations include *all* pension liabilities and expenses based on "current salaries" and ages of all employees, "current seniority", expected pay raises,

"life expectancy" based on "mortality tables", and interest earned in the pension plan. HT II at pp. 75-76. The FAS 106 calculations include similar information, but are associated primarily with "retiree health care" benefits. *Id.* at p. 76.

114. FCA has not obtained a separate calculation of the costs of special pensions as compared with other pension costs in the event of a shutdown. HT II at p. 149. Rather the FAS 87 calculation includes, not only the curtailment cost of special pension benefits, but also the curtailment cost of accrued vested pension payable upon a regular retirement. *Id.* at p. 155. However, an attempt was made to separate out and understand the cost of special pensions from other retirement costs. HT II pp. 155-156. *See also* Findings of Fact (hereinafter "FOF") 119-122 and Exhibits 8 and 9 discussed therein.

115. Consistent with FCA's continuing analysis of the possibility of a reduction in force or shutting down the costly Johnstown facility, in preparing the 2006 budget, FCA Chief Financial Officer Kevin Bagby (hereinafter "Bagby") wanted to factor in a possible 2006 plant shutdown at Johnstown. HT II at p. 66. In response, former FCA President and Chief Executive Officer Carroll informed Bagby that he could factor the shutdown into the budget, but that FCA would continue to operate consistent with "market activity" and would not shut down the Johnstown facility if "business prospects" (*i.e.*, sufficient production demand) indicated that the facility should continue production. *Id.*; Defendant's Ex. 22. Carroll reminded that the general strategy used for the year 2006 would be allocating based upon the cost of the different facilities. HT II at p. 67. Karan explained that, in light of Carroll's reminder, there was no question that the allocation of work was going to be based upon costs of the facilities. *Id.*

116. The *calculations* of potential shutdown costs at Johnstown have never impacted whether or not FCA will decide to shut down the Johnstown facility. HT II at pp. 124-25. Rather, as Carroll explained to Bagby, the production demand and costs to operate Johnstown will dictate if and when the Johnstown facility is shut down; as Karan explained, it goes back to if there isn't any work, there isn't any work, and without any work, operations at Johnstown cannot be continued. *Id.* at p. 125.

117. On February 17, 2006, Karan emailed Garabedian with regard to employees "creeping into the special pensions":

I think we need to tell the persons viewing this analysis that **there is a cost to keeping employees beyond the "sweet spot" as it was called in 1999, if a RIF doesn't occur until after 12/31/2008.** The cost would have two parts, one that we can see in the on going scenario, and the other is if a RIF occurred 12/31/2008 or later, and we did another RIF analysis, **we**

66

**would see higher costs to the RIF because of the amount of employees creeping into the special pensions between 12/31/2006 and 12/31/2008.**

Plaintiffs' Exhibit 6 at p. D-2649 (emphasis added).

118. The "sweet spot," as the term was used in 2000, referred to the time frame when FCA's costs in a shutdown would be the lowest. HT II at pp. 214-215.

119. The February 17, 2006 email reflects the Company's recognition that there is a cost if a RIF doesn't occur until after 12/31/2008 and that that cost is because of the amount of employees creeping into the special pensions between 12/31/2006 and 12/31/2008. HT II at p. 109.

120. On March 2, 2006, Garabedian advised Karan: "From this new postretirement welfare work, there isn't a tremendous difference between a 12/31/2006 or 12/31/2007 shutdown. However, there is marked difference if you wait until the end of 2008." Plaintiffs' Ex. 7.

121. Also on March 2, 2006, Garabedian advised Karan: "Glen, here is a summary of the increase in one-time charges associated with an hourly shutdown on 12/31/2007, and, alternatively, 12/31/2008. Just as we saw with the postretirement welfare results, **there is a considerable increase in the charge if the shutdown occurs on 12/31/2008.**" Plaintiffs' Ex. 8, p. D-2772 (emphasis added).

122. In his March 2, 2006 message, Garabedian forwarded to Karan a message from another Hewitt Associates employee, Karina Limsico, that identified the one time charges "associated with the special termination benefits" as being $6.9 million if the shutdown occurred on December 31, 2006, $7.8 million if the shutdown occurred on December 31, 2007, and $19.2 million if the shutdown occurred on December 31, 2008. Plaintiffs' Ex. 8, p. D-2772. Ms. Limsico explained that "...the special termination benefit charge increases significantly in the 2008 shutdown scenario due to the increase in the number of participants who become eligible for retirement under one of the rules programs." *Id.* at p. D-2773.

123. A March 24, 2006 email message from Karan to Garabedian shows that by that time (if not before), FCA's Board of Directors was involved in reviewing these matters. Under the subject line "RIF analysis," Karan's message states that "This is the work we did in showing the Boad [sic] the cost associated with retaining employees beyond 12/31/2006." Plaintiffs' Ex. 9.

124. The same email of March 24, 2006 includes a question from Karan to Garabedian as whether a present value of the "special benefits" for those not furloughed in a 2006 RIF and who would accrue those benefits in 2008; Karan suggests it was done, but "can't find my copy." Plaintiffs' Ex. 9.

125. On April 19, 2006, Garabedian provided Karan with "a summary of the number of employees who will benefit from special rules treatment [*i.e.* special pensions] at different shutdown dates":

Hourly Employees:

| | |
|---|---|
| 12/31/2006 Shutdown | 100 |
| 12/31/2007 Shutdown | 121 |
| 12/31/2008 Shutdown | 215 |

Distribution of Employees becoming eligible for special rules benefits during 2008:

Prior to June 2008–27

Between June and December 2008–67

This group represents the difference between the 121 who qualify by yearend [sic] 2007 and those who qualify by yearend [sic] 2008.

\*\*\*

Value of Pension Special Rules Increment (per capita):

| | Hourly employees |
|---|---|
| 12/31/2006 Shutdown | $69,000 |
| 12/31/2007 Shutdown | $65,000 |
| 12/31/2008 Shutdown | $89,000 |

In other words, each hourly employee who becomes eligible for special rules in connection with a shutdown at yearend [sic] 2006 will effectively receive an additional pension benefit worth $69,000 using FAS 87.

Plaintiffs' Ex. 10, pp. D-2660-2661.

68

126. This email message to Karan was also sent to Bagby. Plaintiffs' Ex. 10, p. D-2660. Bagby is FCA's Vice President of Finance and Chief Financial Officer. Whalen Dec. (Document No. 24-18 and Plaintiffs' Exhibit 40) ¶ 4. According to the Declaration submitted by another FCA Vice President, Edward Whalen (hereinafter "Whalen"), it was Vice President Bagby, Vice President Whalen, and one other individual who made the decision in 2007 to transfer the GATX orders from Johnstown to Roanoke (see FOF 155). *Id.* ¶¶ 4, 6.

127. Like Karan, Carroll also "asked for what the numbers would look like if the RIF was at 12/31/2006 and 12/31/2007." Plaintiffs' Ex. 3, p. D-2579.

128. On May 3, 2006, Karan asked Garabedian for a roster of the employees that qualify for the special rules. Plaintiffs' Ex. 12. The subject line of this email message is "Re: Demographic Information and Pension Increments in Connection with Shutdown." *Id.*

129. FCA also produced a chart that identifies all Johnstown facility employees and includes no information beyond the employees' names, years of service, hire date, birth date, and age. *See e.g.* Plaintiffs' Ex. 15, pp. D-0212-D0226. The chart specifies numbers of employees eligible for special pensions. *See e.g. id.* at p. D-0224.

130. On May 6, 2006, Garabedian emailed Karan with regard to a "person by person reconciliation of the 43 people who were on our 1/1/2005 file who were not on yours and of the 8 people at the very bottom who were on your file but not ours." Plaintiffs' Ex. 13, p. D-2696. Forwarding a message from Ms. Limsico, Garabedian provided Karan with information regarding numbers of employees eligible for Rule-of-65, 70/80 and normal retirement as of RIF dates of 6/30/2006 and 5/15/2008. *Id.*

131. A document dated October 19, 2006 again charts "Employees Eligible for Special Pension." Plaintiffs' Ex. 16. The chart states that between January 1, 2007 and December 31, 2007, eight employees would pass their last day to work for eligibility. *Id.* An additional 33 would pass their date for special pension eligibility between January 1, 2008 and May 15, 2008. *Id.* An additional 58 would become eligible between May 15 and December 31, 2008. *Id.* Another 14 would become eligible in 2009, and another 173 beyond 2009. *Id.*

132. FCA's 2005 and 2006 studies of special pension costs were undertaken in order to inform decisionmakers and to understand the financial risks of decisions they might make in the face of different economic and industry conditions, including the absence of work. HT II at pp. 119-124.

69

## 5. FCA in 2007

133. During the fourth quarter of 2006, Carroll resigned his position as President and Chief Executive Officer of FCA. HT. at pp. 170-71 ; Defendant's Exs. 5, 6.

134. Under the terms of Carroll's Termination Agreement, Carroll remained with the Company until April 30,2007; Christian Ragot (hereinafter "Ragot") was hired as Chief Operating Officer and as Carroll's designated replacement; and Ragot assumed the position of President and Chief Executive Officer on April 30,2007. HT at p. 171; Defendant's Exs. 5, 6.

135. Ragot's leadership differs from Carroll's in that Ragot's style is much more participative and involves employees at various levels in decisionmaking teams. HT at p. 172. Carroll's style was not participative and, even though Ragot was his designated successor, Carroll involved Ragot in the decisionmaking process as little as possible. *Id.*

136. FCA's Sales and Operations Planning Team (hereinafter "Planning Team") is one of the participative decisionmaking teams established by Ragot. HT at pp. 172-73. The Team is responsible for assigning production to the various facilities in the most productive and efficient manner possible and is co-chaired by Senior Vice President, Marketing and Sales Whalen and Vice President, Operations, Ken Bridges, who are ultimately responsible for the scheduling of production at Johnstown, Danville, and Roanoke. *Id.* at pp. 173-76; Defendant's Exs. 8, 9. The Team's decisions are reviewable only by Ragot. HT at p. 176. Carroll had no involvement in establishing the Planning Team and has had no involvement in its decisions, *because he was no longer employed by the Company,* and neither Karan nor Saylor is a member of the Team. *Id.* at pp. 173, 176-77, 192.

137. The rail car market is roughly 18 months into a cyclical decline, and conditions pretty much across the board are quite poor right now in terms of demand for rail cars. HT at p. 165. Industry-wide backlog of open top hoppers and gondolas (the type cars produced by FCA) totaled 26,008 on December 31, 2005, but had declined to 8,532 as of June 30,2007. Karan Dec. Ex. 1.

138. The rail car order backlog is essentially the number of cars that are on order that are yet to be produced by the manufacturer. HT at p. 165.

139. Howard states in his Declaration: As of January 2007, the Johnstown facility employed 416 hourly employees and 34 salaried employees. Manpower at the Johnstown facility fell to 212

hourly employees and 34 salaried employees in April 2007, and was projected to fall to 42 hourly employees and 8 salaried employees in August 2007. Howard Dec. at ¶ 10.

140. FCA's production has mirrored the market downturn. From a backlog that peaked at 20,729 rail car orders for the year ending December 31, 2005, representing estimated future sales of $1.4 billion, demand for rail cars has plummeted. Karan Dec. at ¶ 46; HT at pp. 165-66; Defendant's Ex. 2. Over the next 12 months, the backlog decreased by more than 11,000 rail car orders, and as of December 31, 2006, the backlog was 9, 315 rail cars, representing estimated future sales of $697 million. Karan Dec. at ¶ 46; HT at p. 166. As of June 30, 2007, the backlog had dropped to 5,589 rail cars, representing estimated future sales of $437 million. Karan Dec. at ¶ 47; HT at pp. 165-66; Defendant's Ex. 3. In short, in 18 months, the backlog representing future sales for FCA dropped by 15,000 rail car orders to a mere quarter of what it was in December 2005, while manufacturing capacity has remained the same. HT at pp. 165-66, 169.

141. Sales and deliveries have plummeted as well. Sales for the three months ended June 30, 2007, were $195 million, compared to $365 million for the same three months ended June 30, 2006, reflecting a decrease of $170 million. Karan Dec. at ¶ 49; HT at p. 167; Defendant's Ex. 3. During the three months ended June 30, 2007, FCA delivered 2,679 rail cars, compared to 4,711 delivered during the same three months ended June 30, 2006. Karan Dec. at ¶ 48. Further, the supplemental agreement for work to be contracted out to Kasgro effectively terminated in March 2007, when the orders were completed at Kasgro, and FCA did not have any new orders pending production. *Id.* at ¶ 35.

142. At the same time, customer inquiries, which occur when a customer submits a "notification" requesting a quote for the production of rail cars, are also down significantly. HT at pp. 168-69; Defendant's Ex. 4.

143. The decrease in rail car orders, rail car order backlog, and customer inquiries has resulted in approximately 700 layoffs at all three of FCA's production facilities in 2007. HT at pp. 169-70. 424 of the 700 furloughed were from the Johnstown facility. *See* FOF 144, 145, *infra*.

144. In February 16, 2007, FCA sent the first two notices pursuant to the Worker Adjustment and Retraining Notification (hereinafter "WARN") Act, 29 U.S.C. § 2101 *et seq.*, announcing that 237 layoffs were scheduled for March 31, 2007. *See* Plaintiffs' Ex. 24.

145. On May 31, 2007, FCA sent a second WARN Act notice, this one announcing 187 layoffs scheduled for July 31, 2007. *See* Plaintiffs' Ex. 25.

71

146. Despite the downturn in the rail car market, in an effort to keep the Johnstown facility in operation, while he was still with the Company, former FCA President Carroll directed that 300 aggregate freight cars be built in Johnstown on speculation that the cars could be sold, even though FCA had not received any customer order to support such a sizeable gamble. HT at pp. 178-79; Defendant's Ex. 10, 11; Saylor Dec. at ¶ 18. The Johnstown "Shop Notes" as of 4/22/07 indicate that production of the first order of 150 aggregate freight cars would finish on May 17, 2007, and the order was built in Johnstown between March 26 and May 30, 2007. Saylor Dec. at ¶ 18; HT at p. 178.

147. Unfortunately, this "extremely risky" endeavor has not paid off, and the first 150 aggregate freight cars could not be sold. HT at p. 178; Saylor Dec. at ¶ 18.

148. Given the Company's inability to sell the first 150 cars, current Company President and Chief Executive Officer Ragot decided that the decision to build cars on speculation was not a particularly wise decision, and he stopped the production of the balance of the 150 cars. HT at p. 179; Saylor Dec. at ¶ 18. Neither Carroll, *who was no longer employed* by *FCA,* Karan, nor Saylor had any involvement in Ragot's decision not to build the second order of 150 cars. HT at p. 179.

149. Carroll's decision to build the 300 aggregate freight cars on speculation continues to harm FCA financially. Despite extensive efforts to sell or lease the cars, FCA has been unable to do so. HT at 179-80; Saylor Dec. at ¶ 18. FCA has roughly $12.5 million in costs tied up in the 150 cars that were produced, and is paying storage fees to store the cars on "third party property." HT at pp. 180, 226-27. Storage fees for these 150 cars for August 2007 alone totaled $8416.00. HT at 226-28; Defendant's Ex. 15. In addition, the materials to construct the "second set" of 150 cars also remain in FCA's inventory. Saylor Dec at ¶ 18.

150. As of April 2007, 500 AutoFlood III cars ordered by Babcock & Brown Rail Funding, LLC, and 250 AutoFlood III cars ordered by CIT, were being manufactured at the Roanoke facility. Saylor Dec. at ¶ 19; HT at pp. 180, 181. Babcock & Brown and CIT are in the business of leasing railroad cars to end users. HT at pp. 180-81. They serve as financing vehicles in that they lease the cars to utilities and other shippers who actually operate the cars. *Id.* at 181.

151. The leasing company category, including Babcock & Brown and CIT, is FCA's largest category of customers. HT at p. 181. Babcock & Brown and CIT are among FCA's top five customers. *Id.*

152. After FCA built 135 of the AutoFlood cars for Babcock & Brown and 115 of the AutoFlood cars for CIT, these customers informed FCA that the completed cars could not be leased to end users and instead went into storage. Saylor Dec. at ¶ 19; HT at p. 182. As a result, Babcock & Brown and CIT insisted that the remainder of the orders be filled with BethGon II cars that were then being manufactured at Danville, or the orders would be cancelled. Saylor Dec. at ¶ 19; HT at p. 182. Babcock & Brown and CIT believed that the BethGon II cars would match up better with their end user demand. HT at p. 182.

153. In order to satisfy the customers, FCA agreed to fill the orders by providing the BethGon II cars, which would be manufactured at Danville (which was already set up to build BethGons), leaving excess manufacturing capacity at the Roanoke facility, which is FCA's most efficient and lowest cost production facility. Saylor Dec. at ¶ 19; HT at pp. 177, 182, 184; Defendant's Exs. 10, 12, 13.

154. Also in April 2007, FCA booked an order for 450 Triple Hopper freight cars to be manufactured for GATX, to commence in August 2007. Karan Dec. at ¶ 53. Since the Roanoke facility was then in the process of filling the Babcock & Brown and CIT orders of AutoFlood cars and had work scheduled through September 2007 on these orders, the tentative decision was made to manufacture these freight cars, which could have been assembled in either Johnstown or Roanoke, at the Johnstown facility. Id.

155. Roanoke is FCA's lowest cost facility because it is more efficient and labor costs are lower at the Roanoke facility – labor costs are significantly less at Roanoke than at Johnstown, and Roanoke produces more cars in fewer hours. HT at pp. 198, 200. The Planning Team began to look at what other work could be moved into the Roanoke facility, that would be more efficient and reduce the cost of production. HT at p. 184. Because both Johnstown and Roanoke are capable of producing the Triple Hopper freight cars and both facilities had available capacity because the orders from Babcock & Brown and CIT had been transferred to Danville, the Planning Team began to look at moving this order to Roanoke. HT at pp. 177,184-85; Defendant's Ex. 10; Whalen Dec. at ¶ 2.

156. Senior Vice President for Marketing and Sales Whalen was co-chair of the Planning Team. HT at p. 173. The Planning Team had its first meeting ever in May 2007. Id. at 174. Its study, called "Project Dixie," was the first done by the Company to make a specific recommendation, and the Planning Team has conducted no additional studies for placement of additional FCA orders. Id. at pp. 192-193, 212. Project Dixie was conducted with the awareness that the Union could initiate litigation asserting that any transfer was to prevent Johnstown employees from earning pensions. Id. at p. 196. In conducting Project Dixie, the Planning Team was aware of and considered the second WARN Act notice as part of its plan to shift work to the Roanoke

73

facility and away from the Johnstown facility. Defendant's Ex. 14, p. D-2937.

157. The Defendant asserts that in making the decision to build the 450 Triple Hopper freight cars, FCA's Planning Team never discussed the cost of pensions and the cost of pensions at the Johnstown and Roanoke facilities did not figure into the decision. HT at p. 186. The Court does not agree with this assertion and finds to the contrary.

158. FCA's Planning Team conducted a comparison between manufacturing this order at Johnstown or at Roanoke, and estimated that performing the assembly in Roanoke, as opposed to Johnstown, would generate savings of approximately $1.48 million, excluding pension costs; the Planning Team also attributed a fifteen percent efficiency factor to production at the Roanoke facility. HT at pp. 185-86; Whalen Dec. at ¶¶ 3-5; Defendant's Ex. 14. Subsequently, a decision was made by the Planning Team to manufacture this order in Roanoke instead of Johnstown. HT at p. 186

159. If the Company had been able to book additional orders to utilize the less expensive production capabilities in Roanoke, this order for Triple Hopper freight cars would have been produced in Johnstown. Karan Dec. at ¶ 53.

160. The Defendant asserts that despite the downturn in the industry, it continued its efforts to book orders into Johnstown. HT at p. 221. However, the Court finds to the contrary that the Defendant avoided production of rail cars at the Johnstown facility in an effort to minimize costs, in particular pension costs and associated benefits.

161. In early July 2007, FCA tentatively booked an order to replace the floors of 196 freight cars for a customer, work that was projected to be performed at Johnstown. HT at p. 221; Saylor Dec. at ¶ 20. The work would have lasted approximately five weeks and would have required the recall of approximately 25 employees to perform the work. HT at pp. 221-22; Saylor Dec. at ¶ 20. However, a dispute with the customer over warranty issues has delayed this order indefinitely. HT at p. 222; Saylor Dec. at ¶ 20.

162. Production levels at Danville and Roanoke have plummeted in 2007. From June 2004 until June 2007, the Danville facility operated two shifts of production of rail cars. Jordan Dec. at ¶ 10. The production ranged from 26 to 34 cars per day, depending on the car type. *Id.* Since July 2007, the Danville facility has reduced production to only sixteen rail cars per day and is operating one shift only. *Id.* Further reductions in the Danville workforce are expected in December 2007 when existing scheduled orders are completed. *Id.*

163.    In early 2006, the Roanoke facility was producing thirty rail cars per day and employed approximately 450 hourly employees. Wyss Dec. at ¶ 12. In 2007, orders for the Roanoke facility dropped significantly. *Id.* Currently, the Roanoke facility is operating only one shift and producing only 14 cars per day. *Id.* There are few orders for 2008 and at best, Plant Manager Eugene Wyss estimates that Roanoke will average no more than 14 cars each day for the next 16 months. *Id.* Further, unlike the two previous years when Roanoke built only one type of car on its two production lines, in 2007 Roanoke has received only small orders that require many changeovers of jigs and fixtures. Without any new orders, when Roanoke completes a current rail car order in early September of 2007, another 150 employees at the Roanoke facility will be laid off. *Wyss Dec.* at ¶ 13.

## 6.    **Johnstown Facility's Imminent Closure**

164.    FCA recently filed a Form 8-K with the Securities and Exchange Commission attaching a September 20, 2007 press release announcing that the Company had informed the Union that it was considering closing the Johnstown facility. Plaintiffs' Exhibit 32.

165.    By letter dated September 21, 2007, FCA advised the USW that "the company is giving serious consideration to permanently closing the Johnstown facility" and asked for decisional bargaining. Plaintiffs' Exhibit 58.

166.    Pursuant to the controlling CBA, FCA may permanently close the Johnstown facility within 60 days of providing notice to the Union if the Company engages in decisional bargaining with Union officials after notice has been provided. Karan Dec. at ¶ 36. In bargaining with the Union, FCA asked for $30 per hour in concessions. HT II, pp. 210-211.

167.    In the decisional bargaining, FCA sought concessions from the USW in order to avoid a shutdown of the Johnstown facility. HT II at p. 210.

168.    Permanent closure of the Johnstown facility would prevent approximately 100 employees hired between December 21, 1987 and March 31, 1989 from attaining the 20 years of service required for a Rule-of-65 pension. Vatavuk Dec. ¶¶ 12, 13 & Exhibit A, pp. 1-7. Similarly, permanent closure of the Johnstown facility would prevent 82 employees hired between August 16, 2004 and October 11, 2004 from attaining the three years of service that would allow them to attain eligibility for a deferred vested pension through post-layoff service accrual. Vatavuk Dec. ¶¶ 6-7 & Exhibit A, pp. 8-10.

169. On December 18, 2007, the Defendant filed a Form 8-K which read in part:

> On December 18, 2007, the Board of Directors of FreightCar America, Inc. ("the Company") approved a plan to close the Company's manufacturing facility located in Johnstown, Pennsylvania and relocate certain production from the Johnstown facility to other existing facilities. This action was taken to further the Company's strategy of achieving cost parity among its different facilities and lowering its cost structure. The Company had entered into decisional bargaining with the union representing its Johnstown employees regarding labor costs at the Johnstown facility but did not reach an agreement with the union that would have allowed the Company to continue to operate the facility in a cost-effective way.

> The Company estimates that it will record a pre-tax restructuring and impairment charge during the fourth quarter of 2007 of approximately $34.3 million ($21.2 million, net of tax) in connection with the closure of the Johnstown manufacturing facility and cessation of operations at the facility. Approximately $28.1 million of this restructuring and impairment charge (on a pre-tax basis) relates to net curtailment losses and costs of contractual benefits arising under the Company's pension and other post-retirement benefit plans. One-time employee termination benefits for severance and medical insurance are estimated to be $2.1 million on a pre-tax basis. The restructuring and impairment charge will also include a non-cash reduction of the carrying value of certain assets at the Johnstown manufacturing facility. These assets currently have a book value of approximately $4.1 million and are comprised of land, a building and equipment. The Company, with the assistance of an independent third-party valuation specialist, is currently performing a complete valuation analysis on these assets as well as estimating the costs related to preparing the facility for closure. The Company is also currently assessing potential capital expenditures at the Company's other facilities that will absorb production from the Johnstown plant and the cost to transfer equipment to these other Company facilities. Cash payments for one-time employee termination benefits will be made during 2008, while the cost of pension and other post-retirement benefits will be paid during future periods, in connection with additional funding of the Company's pension and post-retirement benefit plans. The foregoing figures are estimates, and the Company will not know the amounts of the anticipated costs and cost savings relating to the facility closure until it has finalized the details of its closure plan;

170. The Danville facility is scheduled to ship its last car on December 21, 2007, at which time the plant will halt production and the Danville employees will be laid off. HT at pp. 177-78; Defendant's Ex. 10. Accordingly, on October 9, 2007, FCA provided a WARN Act notice to, among others, Tony Tallarita, the local union president at the Danville facility, projecting layoffs at that facility of 120 employees commencing on December 17, 2007, 149 employees

commencing on January 7,2008, and 16 employees commencing on January 25, 2008. HT II at pp. 84-85; Defendant's Ex. 29.

171. Anderson acknowledged that FCA has been laying off employees from both the Danville and Roanoke facilities throughout 2007. HT p. 93.

172. Article XXVI of the CBA permits FCA to assign work to its various facilities and states that (i) "[n]othing herein shall restrict the Employer regarding the operation of its currently (as of the effective date) owned assets that are not covered by this Agreement," and (ii) "[n]othing herein, including Article II, shall prevent the Employer from purchasing assets to assemble freight cars, provided that such purchases are for bona fide business purposes and that the Employer owns, controls and operates such assets. Such purchase of the relevant fixed assets may be financed through leasing (including an operating lease), provided it is a bona fide transaction (not intended to circumvent the Contract Out provisions of this Agreement) and the Employer fully controls and operates the assets and directly employs the employees who work there." Karan Dec. at ¶ 30.

173. Despite FCA's right to assign work to its various facilities consistent with Article XXVI of the CBA, the USW filed two grievances in July 2007, each of which contend that FCA has violated the CBA by assigning work to the Danville and Roanoke facilities. Howard Dec. at ¶ 14.

174. Grievance No. 07-055 states that the Company has failed to make the required investment under the CBA, has not afforded 40 hours of work to employees with 20 or more years of service, and has leased a facility to assemble freight cars with the intent to circumvent the contracting out provisions of the CBA. Howard Dec. at ¶ 15. The USW seeks a remedy that would make all affected employees whole in terms of wages and benefits. Id. According to Jastrzab and Anderson, the USW's proposed remedy would provide backpay for any employee who has lost work as a result of the Company's decision to assign work to the Roanoke facility, which, as noted, was a decision made in accordance with Article XXVI of the CBA. HT at pp. 66, 93.

175. Grievance No. 07-056 states that the Company is violating Article II and Article XXVI in that the Company intentionally contracted out cars to Roanoke and Danville. The USW seeks a remedy that would re-schedule work at the Johnstown facility. Howard Dec. at ¶ 16. However, as noted, the decision to assign work is solely a Company decision under Article XXVI of the CBA. According to Jastrzab and Anderson, the USW's proposed remedy for this grievance would move work from the Roanoke facility to Johnstown. HT at pp. 67, 93.

176. Pension eligibility for the production and maintenance employees at the Johnstown facility is outlined in Section 2 of the Plan. Howard Dec. at ¶ 2. The Plan provides bargaining unit members with several different types of pension benefits. Howard Dec. at ¶ 2, Ex. 1; Anderson Dec. at 8; FOF 48-51.

177. As noted, under the Plan, employees who are absent from work for up to two years due to layoff or disability continue to accrue service for up to two years. Howard Dec. at ¶ 2, Ex. 1, § 5. Consistent with the Plan language, if an employee is absent from the plant because of layoff or physical disability, Article X, Section 3(b) of the CBA provides that he shall continue to accumulate continuous service during such absence for two years. An employee with less than two years of continuous service will only accumulate service for an additional period equal to his length of continuous service at the commencement of such absence. Karan Dec. at ¶ 38; Anderson Dec. at ¶ 12. Further, Article XXVII of the CBA permits an employee whose employment is terminated as a result of FCA's decision to permanently close the plant or discontinue an entire seniority unit of the Plant or a substantial portion thereof, to request layoff in lieu of termination, thereby allowing continuous service to continue to accrue. Karan Dec. at ¶ 37.

178. The age and service of the workforce is always changing, and as a result, employees regularly become eligible for special pensions, and subsequently regular pensions, based on their age and service. HT at p. 226; HT II at p. 145. For example, Jastrzab explained that 33 employees were on the cusp of eligibility for special pensions in the 2003-2004 timeframe, and as of today, they have all met the eligibility requirements to obtain the special pensions. HT at p. 65.

179. Danville and Roanoke employees participate in a 401k Plan, which has a five-year vesting schedule for the employer's contributions. Jordan Dec. at ¶ 11; Wyss Dec. at ¶ 13. Employees who do not attain five years of service do not fully vest and, therefore, forfeit the non-vested employer contributions to their pensions. Jordan Dec. at ¶ 11; Wyss Dec. at ¶ 13.

180. As noted, FCA is a publicly traded company, and as such it has an obligation to its shareholders to operate the Company in as efficient and cost conscious manner as possible. Thus, FCA officials, in attempting to convince the USW to make a meaningful proposal that would reduce costs and save jobs, have consistently reiterated that it would assign future work depending upon capacity, economic demand, and the costs at the Johnstown facility relative to other facilities. Karan Dec. at ¶ 42. The decision to manufacture the 450 Triple Hopper freight cars in Roanoke at a cost savings of $1.48 million is consistent with this principle. *Id.* at ¶ 53.

181.  Further, and consistent with its obligation to run the Company in an efficient and cost conscious manner, FCA has negotiated a broad management rights clause in the CBA, which provides that the management of the plant and the direction of the work force and operations at the plant, including the laying off and calling to work of employees in connection with the reduction or increase in the working forces, the scheduling of work and the control and regulation of the use of all equipment and other property of the Employer are the exclusive functions of the management. Karan Dec. at ¶ 29.

182.  Although the Plaintiffs contend that FCA is moving machinery and equipment out of the Johnstown facility, *Anderson Dec.* at ¶ 53, the movement that Plaintiffs have observed is nothing more than the ordinary course of operation of an integrated business consistent with FCA's right under the management rights clause to regulate the use of all equipment and other property of the Employer. As part of a single integrated business, FCA's manufacturing facilities routinely exchange equipment and materials among themselves. Saylor Dec. at ¶¶ 3-11; Jordan Dec. at ¶¶ 6,8-9; Wyss Dec. at ¶¶ 5-10. It has been a common practice for FCA to ship jigs, fixtures, and other production equipment, such as platforms and lifting devices, between the Johnstown, Danville, and Roanoke facilities when needed to produce an order of rail cars or do production and repair work. Saylor Dec. at ¶ 3; Jordan Dec. at ¶ 8; Wyss Dec. at ¶ 7. Lifting devices such as jib hoists and portable cranes used to build the rail cars are regularly moved between these three facilities. Saylor Dec. at ¶ 4; Wyss Dec. at ¶ 9. FCA also transfers excess material left over from previous orders among the plants to be used in future orders. Saylor Dec. at ¶ 12. Further, and contrary to Anderson's testimony that FCA has never moved more than a box of bolts between facilities, the jigs, fixtures, platforms, and lifting devices are rather large items. For example, the yoke riveter shipped into Johnstown in the Fall of 2006 for use in a triple hopper order weighed about 4,000 pounds. HT at pp. 220-221.

183.  When FCA opened the Danville facility in 1995, numerous jigs and fixtures were moved to Danville from Johnstown. Jordan Dec. at ¶ 6; Wyss Dec. at ¶ 7. This equipment was relocated to Danville so that FCA could repair and produce certain types of rail cars there that had previously been built in the Johnstown facilities. Wyss Dec. at ¶ 7.

184.  When the Roanoke facility opened in 2004, some of the equipment in Roanoke had been shipped from Johnstown. Wyss Dec. at ¶ 9. This included platforms and lifting devices, riveter cylinders and other parts for maintaining equipment. *Id.* Also, Danville shipped jigs and fixtures to Roanoke for use in Roanoke's first order in late 2004 and in 2005. Jordan Dec. at ¶ 9; Wyss Dec. at ¶ 8.

185.  The USW contends that FCA has begun removing machinery and equipment from the Johnstown facility. Anderson Dec. at ¶ 53. To the extent that this statement is contrary to the

longstanding practice of sharing equipment and materials among the manufacturing facilities, it is false. HT at pp. 218-220. FCA recently transferred "approximately five truckloads of jigs, fixtures and materials from Johnstown to Roanoke, related to the order to be produced in the Roanoke facility." Saylor Dec. at ¶ 11. Efforts are also under way to move much of the excess materials related to the speculative order of Aggregate Freight Cars directed by Carroll and cancelled by Ragot to facilities where it can be utilized in other orders. HT at pp. 218-19. This inventory of excess materials is valued at approximately \$4.5 million. *Id.* at p. 219.

186. The employees in Danville participate in a 401k Plan, which has a five year vesting schedule for the employer's matching contribution. Jordan Dec. at ¶ 11. Approximately two-thirds of the Danville employees have less than five years of service, and if they lose their jobs they will not fully vest in and will therefore forfeit the employer's contributions; not to mention the loss of their livelihoods. *Id.*

187. The employees in Roanoke participate in a 401k Plan, which has a five year vesting schedule for the employer's matching contribution. *Wyss Dec.* at 3. Since all of the Roanoke employees have less than five years of service, if they lose their jobs, they will not fully vest in and will therefore forfeit the employer's contributions, and like those in Danville, will also risk the loss of their livelihoods. *Id.*

188. Similarly, employees at Johnstown risk the impairment of their pension rights. However, with respect to the employees laid off from the Johnstown facility, there are no more than 26 who, by reason of having been laid off at this time rather than at the expiration of the CBA on May 15, 2008 are not expected to accumulate sufficient age and service on layoff to qualify for 70/80 or Rule-of-65 retirement. HT II at pp. 27-28; Howard Dec. at ¶ 11. Even if the GATX order of 450 rail cars had been built in Johnstown, with the work finishing in January 2008, there are no more than 7 employees who, by reason of having been laid off in August 2007 rather than in January 2008, are not expected to accumulate sufficient age and service on layoff to qualify for 70/80 or Rule-of-65 retirement. HT II at p. 27; Howard Dec. at ¶ 11.

189. As noted, the manufacture of 450 Triple Hopper freight cars for GATX is expected to be performed at Roanoke from September 17, 2007 through January 9, 2008. Karan Dec. at ¶ 54. According to the local union chairman at the Roanoke facility, Tony Williams, any decision to reassign this work to another location would seriously affect the employment level at Roanoke. Williams Dec. (Document No. 24-19) at ¶ 6. If the construction of these 450 cars does not occur at Roanoke as scheduled, it will have a sudden and severe impact on the wages and benefits of approximately 100 employees. *Id.* The reassignment of this work would not only affect the employees but would also impact the employees' families and the community. *Id.*

80

## B. Conclusions of Law

1. This matter involves an alleged violation of section 510 of the Employee Retirement Income Security Act (hereinafter "ERISA") codified at 29 U.S.C. § 1140 and therefore, this Court has subject matter jurisdiction over the case *sub judice* pursuant to 28 U.S.C. § 1331, 29 U.S.C. § § 1132 (e)(1) and (f) with venue being proper under 29 U.S.C. § 1132(e)(2).

2. Federal Rule of Civil Procedure 65(a)(1) permits a district court to "issue a preliminary injunction only on notice to the adverse party." The Plaintiffs and Defendant participated in a preliminary injunction hearing where evidence was taken and the record was closed with proposed findings of fact and conclusions of law ordered to be submitted by the parties to the Court for its review.

3. "The test for preliminary relief is a familiar one. A party seeking a preliminary injunction must show that (1) it has a likelihood of success on the merits, (2) it will suffer irreparable harm if the injunction is denied, (3) granting preliminary relief will not result in even greater harm to the nonmoving party, and (4) the public interest favors such relief."

    *Rogers v. Corbett*, 468 F.3d 188, 192 (3d Cir. 2006)(citations omitted).

4. Courts "should endeavor to "balance[ ] these four ... factors to determine if an injunction should issue." *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999)(citation omitted)

### 1. Likelihood of Success on the Merits

5. 29 U.S.C. § 1140 states:

    It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan...for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

    \*\*\*

    The provisions of section 1132 of this title shall be applicable in the enforcement of this section.

81

6.    A civil action may be brought--

      \*\*\*

      (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which
      violates any provision of this subchapter or the terms of the plan, or (B) to obtain other
      appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions
      of this subchapter or the terms of the plan

29 U.S.C. § 1132. *See also Eichorn*, 484 F.3d at 654-657.

7.    At all pertinent times, FCA is or has been Plaintiffs' "employer" within the meaning of ERISA,
      as set forth in 29 U.S.C. § 1002(5).

8.    FCA is also a "plan sponsor," "fiduciary," and "administrator" of "employee pension benefit
      plan" and "employees welfare benefit plan" providing pensions, retiree medical, and retiree life
      insurance benefits, as those terms are used or defined in ERISA set forth at 29 U.S.C. § 1002.
      Among these employee benefit plans is the "FCA Pension Plan" which is an "employee pension
      benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(2). Also among these employee
      benefit plans is the Johnstown America Corporation Hourly Employee Medical, Dental and
      Visions Plan (hereinafter "FCA Welfare Plan") which is an "employee welfare benefit plan"
      within the meaning of ERISA, 29 U.S.C. § 1002(1).

9.    The Plaintiffs intend to present their claims under 29 U.S.C. § 1140 with direct evidence of the
      Defendant's "specific intent" to interfere with their rights under the pension and welfare benefit
      plans. *See* Plaintiff's Proposed Conclusions of Law (hereianfter "COL") 8-18 (Document No.
      60 (Sealed)).

10.   To establish a *prima facie* claim for a violation of 29 U.S.C. § 1140, the Plaintiffs must prove
      "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment
      of any right to which the employee may become entitled." *Gavalik v. Continental Can Co.*, 812
      F.2d 834, 852 (3d Cir. 1987).

11.         "To recover under § 510, a plaintiff need not prove that "the *sole* reason for his
            [or her] termination was to interfere with pension rights." *Titsch v. Reliance
            Group, Inc.,* 548 F.Supp. 983, 985 (S.D.N.Y.1982), *aff'd,* 742 F.2d 1441 (2d
            Cir.1983) (emphasis in original). A plaintiff must, however, demonstrate that the
            defendant had the " 'specific intent' to violate ERISA." *Watkinson v. Great
            Atlantic & Pacific Tea Co., Inc.,* 585 F.Supp. 879, 883 (E.D.Pa.1984) (quoting

                                        82

*Titsch, supra* ). Proof of incidental loss of benefits as a result of a termination will not constitute a violation of § 510. *See Titsch,* 548 F.Supp. at 985 ("No ERISA cause of action [under § 510] lies where the loss of ... benefits [i]s a mere consequence of, but not a motivating factor behind, a termination of employment.")."

*Gavalik v. Continental Can Co.*, 812 F.2d 834, 851 (3d Cir. 1987).

12. "§ 510 of ERISA requires no more than proof that the desire to defeat pension eligibility is "a determinative factor" in the challenged conduct." *Gavalik* at 860.

13. Discrimination by an employer must be one "determinative factor" not the only "determinative factor." *Gavalik*, at 859-860.

14.       That the avoidance of pension liability was Continental's *sole* purpose in instituting the liability avoidance program cannot be gainsaid. Nor can it be seriously contended that the liability avoidance scheme was legitimately designed to save the company from economic ruin.

      Section 510 proscribes exactly this type of conduct. In enacting this provision, Congress recognized that it may sometimes be in the employer's economic self-interest to abort its employees' accumulation of the requisite age and service prior to vesting. Congress sought to provide safeguards for such abuses and to ensure that "an employer cannot fire anybody with impunity to avoid pension liability." 2 *Legislative History of the Employee Retirement Income Security Act of 1974,* at 1811 (1976) (remarks of Senator Javits). Thus, section 510's essential purpose is to prevent employers from intentionally interfering with impending pension eligibility whether motivated by malice toward the particular employee(s) or by a general concern for the economic stability of the company. Of course, as we noted *supra,* incidental loss of pension benefits as the result of a legitimate business practice will not constitute a violation of ERISA. Bad faith, however, is not an element of a section 510 claim.

*Gavalik* at 857 n. 39.

15.       To recover, a plaintiff must demonstrate that the defendant had the " 'specific intent' " to violate § 510. *Id.* This requires the plaintiff to show that "the employer made a conscious decision to interfere with the employee's attainment of pension eligibility or additional benefits." *Id.* at 523 (citing *Gavalik v. Continental Can Co.*, 812 F.2d 834, 860 (3d Cir.1987)). The plaintiff may use

both direct and circumstantial evidence to establish specific intent, but when the plaintiff offers no direct evidence that a violation of § 510 has occurred, the court applies a shifting burdens analysis, similar to that applied in Title VII employment discrimination claims. *See Gavalik*, 812 F.2d at 851-53 (applying the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), shifting burdens mechanism).

*DiFederico v. Rolm Co.*, 201 F.3d 200, 204 -205 (3d Cir. 2000). *See also Jakimas v. Hoffmann-LaRoche, Inc.*, 485 F.3d 770, 785 (3d Cir. 2007).

16. Plaintiff Hayden for himself and on behalf of the deferred vested pension subclass has failed to demonstrate a specific intent on the part of FCA to discriminate against the deferred vested pension subclass in violation of 29 U.S.C. § 1140. The only evidence produced was that this subclass lost its benefits by reason of its furlough and such evidence is not sufficient. *See Jakimas v. Hoffmann-LaRoche, Inc.*, 485 F.3d 770, 785 (3d Cir. 2007).

17. In contrast, Plaintiffs Sowers and Zanghi have demonstrated their reasonable likelihood of success on the merits as to a claim that FCA discriminated against the special pension subclass in violation of 29 U.S.C. § 1140. They have done this by both direct and circumstantial evidence of such discrimination.

18. In those limited circumstances where direct evidence of the discrimination is produced for a violation of 29 U.S.C. § 1140, the courts employ the "mixed-motive" analysis announced in the case of *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). *See Staceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095-1096 (3d Cir. 1995).

19. Plaintiffs Sowers and Zanghi's direct evidence consists of the remarks of Carroll and Karan in the July 21, 2005 meeting with Jastrzab, Anderson and other union officials. FOF 68, 90. Such statements are not hearsay, but admissions by party-opponents admissible under Federal Rule of Evidence 801(d)(2)(D) as Carroll was FCA's President and CEO at this time (FOF 20) and Karan has been FCA's Vice President of Planning and Administration since November 2004 (FOF 21). Saylor, FCA's Vice President of Operations at the Johnstown Facility (FOF 22) was also at this July 21, 2005 meeting. Plaintiffs' Ex. 29.

The comments of Saylor as to statements of Carroll in FOF 90 are admissible under Federal Rules of Evidence 805 (hearsay within hearsay) and 801(d)(2)(D) (admission by party opponent-agent or servant) in that Saylor is repeating the comments of Carroll to Jastrzab and Anderson at a time when Saylor was FCA's Vice President of Operations at the Johnstown Facility (FOF 22), Carroll was President and CEO of FCA (FOF 20) and the matter concerned FCA's "business plan" and the stated negotiation goals of FCA for the mid-term negotiations with the USW. Saylor was one of FCA's officers tasked by FCA to engage in the midterm negotiations with USW during this time period. *See* Defendant's Exs. 16, 18, 19, 20, 23, 24,

26. Thus, both statements are admissions by a party opponent satisfying F.R.E. 805. *See also* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 805.03 (2d ed. 2007).

20. With Plaintiffs Sowers and Zanghi, having produced direct evidence of FCA's specific intent to discriminate against the special pension group subclass and the subsequent furlough of members of that subclass in order for FCA to interfere with the eligibility for this subclass's pension rights, under a "mixed-motive" analysis, the burden shifts to FCA to produce evidence demonstrating that it would have ordered the furlough of the members of the special pension group subclass absent their intent to interfere with their eligibility for their special pensions. *Price Waterhouse*, 490 U.S. 244-245, 109 S.Ct. 1775, 1787-1788, 104 L.Ed.2d 268, 284 (1989).

21. The Defendant argues that Carroll, Karan and Saylor are not the relevant decisionmakers, but that Ragot, Whalen and Bridges are and it was the latter three who made the decision to shift work to the Roanoke facility in accord with Project Dixie without any consideration of special pension costs, that Carroll made no decision as to the 2007 furloughs and that the midterm negotiations with the USW concerned costs of production, not special pension costs. Defendant's Proposed COLs 7, 8,10-19 (Document No. 57). Furthermore, the Defendant argues that Carroll prior to his departure from FCA created work for the Johnstown facility upon speculation that the 300 cars he ordered to be made would be sold. *Id*. at COL 18. The Court disagrees with the Defendant on these points.

22. First, the Court finds that Carroll's order of 300 rail cars in 2007 on speculation was disingenuous in that mid-term negotiations with the USW had failed to attain a $15 or even his last request of $13 per hour cost reduction after he and FCA corporate officers complained of the high production costs at the Johnstown facility; if he wanted to keep the Johnstown facility open, he could have assigned the speculative order to a lower cost facility and brought work actually ordered from a customer of FCA's into the Johnstown facility. The speculative order is inconsistent with Carroll's adamant stance that costs at Johnstown had to be reduced, coupled with his inability to obtain such reductions through negotiations, and is also inconsistent with the timing of his impending departure from FCA, in that considering his failure to obtain costs reductions, it is unlikely that a departing CEO would create a financially questionable 300 rail car speculative order at FCA's highest cost facility.

23. Second, two of the decisionmakers and company representatives during mid-term negotiations, Karan and Saylor remained with FCA after Carroll left on March 31, 2007. Karan signed the two WARN acts notices of the February and July furloughs. Karan issued the first WARN act notice in February while Carroll was still with FCA and it is noted that Carroll rarely involved Ragot in his decisionmaking, FOF 135. With the furloughs beginning in March 2007, Karan follows through with the company plan to continue the furloughs in July 2007 by issuing the second WARN Act notice. The names of Ragot, Bridges, and Whalen, who the Defendant argues were the relevant decisionmakers at this time, were not on this second WARN act notice.

However, the second WARN Act notice is consistent with and part of the decision of Bridges and Whalen's Planning Committee to shift work to the Roanoke facility and out of the Johnstown facility. FOF 156. Ragot did not prevent the issuance of this second WARN Act notice. *See* COL 26, *infra*. Under these circumstances, it appears to the Court that the establishment of the Planning Committee was an attempt to create a vehicle to carry on with the business plan adopted under Carroll's administration.

24. Third, FCA argues that Carroll's remarks are "stray remarks" because he is not the relevant decisionmaker, Defendant's Proposed COLs 20-24, however, the business plan of FCA was not altered with a change in the CEO and President and these remarks remained the goals of FCA.

25. The Third Circuit has recognized that "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."

    *Ezold v. Wolf, Block, Schorr and Solis-Cohen,* 983 F.2d 509, 545 (3d Cir.1992).

26. Carroll's comments were made in 2005 prior to and, according to Saylor, during the mid-term negotiations; they were not stray remarks, but remarks that were directed to members of the special pension group subclass, their eligibility for such pensions and their potential furloughs, *see Ezold v. Wolf, Block, Schorr and Solis-Cohen,* 983 F.2d 509, 545 (3d Cir. 1992), *supra.* Carroll was a decisionmaker and stayed with FCA until April 2007 and his remarks clearly went to the decision of the issue of reassigning work and furloughing the workforce at Johnstown. Karan, although not CEO, was a corporate vice president who facilitated FCA's discussion with Hewitt Associates concerning the realization of costs for pensions and confirmed Carroll's remarks through his testimony. FCA would have the Court believe that Carroll is not the relevant decisionmaker in the present civil action and that the current CEO, Ragot, made the decision to shift work away from Johnstown and stop production of Carroll's speculation order of 300 rail cars, but Ragot began as CEO on May 1, 2007 after the first furloughs were already completed. Carroll's control of decisonmaking continued through March 2007 as he ordered the production of the 300 freight cars on speculation with production beginning on March 26, 2007 and completing on May 17, 2007. Saylor Dec. ¶ 18. Karan, who engaged in the July 21, 2005 meeting with the Union and the midterm concessionary negotiations that began in 2005 signed off on the WARN Act notices of February 13, 2007 and May 31, 2007 evidencing the continued company policies from Carroll's administration to Ragot's administration. The Court notes again that Ragot did not object to Karan's second WARN Act notice, and in fact the furloughs resulting from that notice were anticipated and planned for by members of the Planning Team (appointed by Ragot) that developed Project Dixie which planned the redirection of orders from Johnstown to Roanoke. FOF 156. The short period of thirty days between the commencement of Ragot's administration and the second WARN Act notice allows the Court to conclude that the issuance of such a notice was not Ragot's independent decision, but a decision to continue with Carroll's business plan with regard to the Johnstown facility.

27. After over a year of mid-term negotiations, which did not result in the reduction in production costs, pension costs and changes in work-rules and other matters, Carroll directed Karan to offer a market-based guarantee of work to the USW to allay any concerns that if they made any concessions that the Johnstown facility would close; Karan did this in the January 16, 2007 meeting between Karan, Saylor and Howard representing FCA and Jastrzab, Anderson and others representing the USW. HT II at pp. 72-74; Defendant's Ex. 26. The Court notes this was after the time of Carroll's official departure as CEO and President, but while he was retained in that position until April 30, 2007 during the transition period for Ragot's entrance. After the USW's rejection of FCA's offer, Karan indicated that FCA was no longer willing to meet with the USW in light of the inability to bridge their differences. Defendant's Ex. 26. Part of the proposal for this meeting was an elimination of the Rule-of-65 and 70/80 pensions for persons hired after January 1, 2004. Defendant's Ex. 27, p. 1.

28. Looking back in time from January 2007 through 2006, Karan's notes of the December 20, 2006 meeting between Carroll, Karan and Chad Apiliski, on behalf of the USW, also indicate that elimination of special pensions for those under ten years of service was one thing FCA required. Previously, in a June 14, 2006 meeting, FCA wanted elimination of "future accruals" for the special pensions after May 15, 2008. Defendant's Ex. 23. In a January 13, 2006 email from Carroll to Bagby, Carroll indicated he would assign work among FCA facilities based on cost and requested Bagby to calculate the cost a of a shutdown of the Johnstown facility by December 31, 2006. Defendant's Ex. 22. Prior to that, in a letter dated November 9, 2005, FCA sought a complete "freeze" on service accrual for the special pensions. FOF 81; Defendants' Ex. 17. These items indicate some flexibility in FCA's bargaining position with respect to special pensions with regard to the issue of keeping the Johnstown facility open.

29. However, after mid-term negotiations failed to result in the changes sought by FCA and in light of FCA's perception of the Johnstown facility's economic liabilities under the CBA, FCA's flexibility on its special pension position ended. Carroll's comments of July 21, 2005 then came to the forefront and, according to Karan, HT II at p. 74-75, the need to consider different scenarios with the Johnstown facility in light of the limited backlog of FCA and the perceived financial liabilities of the CBA in Johnstown became a reality. Karan in accordance with Carroll's remarks and the "business plan" of FCA began furloughs on February 17, 2007, (one month after the final January 16, 2007 meeting) because FCA had concluded that any continued assignment of work to the Johnstown facility would cost more (including pension liabilities) than assignments to the Danville and Roanoke facilities. Karan thus acted on the furloughs of the special pension subclass at a time in July 2007 in order to effectively prevent FCA from incurring any further liabilities regarding special pension group subclass recognizing the subclass's need for service time of twenty years and one day and the fact that any furlough would be credited toward service for pension benefit purposes only up to a period of two years. Ragot, although without any public comments to the USW on the matter of the furloughs or special pensions at the Johnstown facility agreed with Karan's actions by directing, or at least

failing to prevent, the issuing of the second WARN Act notice.

30.    Thus, Plaintiffs Sowers and Zanghi have demonstrated through direct evidence that FCA's timing in its Johnstown layoffs and its imminent shutdown of the Johnstown facility was motivated by a specific intent to interfere with the special pension group subclass's attainment of the necessary age and service requirements of their special pensions thus establishing a *prima facie* violation of 29 U.S.C. § 1140. FCA has failed to prove that it would have furloughed the special pension group subclass absent achieving elimination of the special pensions (as reflected in Carroll's remarks) as Carroll made clear the furloughs would occur if FCA did not attain its financial goals in mid-term negotiations.

31.    Alternatively, Plaintiffs Sowers and Zanghi have also set forth circumstantial evidence of FCA's discrimination against them in order to prevent their eligibility for special pensions.

32.    The burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) applies to claims of discrimination under 29 U.S.C. § 1140 when only circumstantial evidence of the discrimination exists.[8]

33.    First, a plaintiff must present his *prima facie* case; if he does, the burden of production shifts to the defendant to prove "some legitimate, nondiscriminatory reason for the employee's rejection" and if proven, the burden of production shifts back to the plaintiff to demonstrate that the "stated reason for [the defendant's action] was in fact pretext." *McDonnell Douglas* at 802-804, 93 S.Ct. 1817, 1824-1825, 36 L.Ed.2d 668, 677-679. "The burden of establishing a *prima facie* case is not onerous." *Jakimas v. Hoffmann-LaRoche Inc.,* 485 F.3d 770, 787 (3d Cir. 2007)(citations omitted).

34.    In establishing the elements of the *prima facie* claim, *see* COL 9, the Plaintiff has produced circumstantial evidence which includes the following sequence of events as culled from the findings of fact above and summarized as follows: FCA had abolished the special pensions in 2002, but the plans were reinstated and are a part of the current CBA which is in effect from February 25, 2005 until May 15, 2008; the CBA presented relatively high costs in labor and

---

[8]The Court recognizes that the evidentiary analyses utilized in the ERISA context are borrowed from other employment discrimination causes of action, specifically from Title VII, and that the case of *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) changed the landscape of mixed motive cases to permit circumstantial evidence in addition to direct evidence to prove a mixed motive claim. This change reflected in *Costa* does not appear to have been translated yet into the ERISA context by the Court of Appeals for the Third Circuit. Nevertheless, to the extent that circumstantial evidence can be used to prove discrimination under 29 U.S.C. § 1140 in a mixed motive claim, consistent with *Costa,* the Court would find that the following analysis of circumstantial evidence would also support a mixed motive claim by Plaintiffs Sowers and Zanghi of discrimination in violation of 29 U.S.C. § 1140. For a review of the impact of *Costa, see* Judge McVerry's opinion in *Cobetto v. Wyeth Pharmaceuticals,* C.A.No. 05-1677, 2007 WL 3034452, 2007 U.S.Dist. Lexis 76255 (W.D.Pa. Oct. 15, 2007).

retirement benefits as compared to FCA's Danville and Roanoke facilities; beginning in March 2005, FCA contracted with Hewitt Associates to attempt to calculate the costs of shutdown for the Johnstown facility, specifically isolating the cost of special pensions in each shutdown scenario, *see* Plaintiff's Ex. 57, HT II pp. 121-124, FOF 132; armed with this knowledge and aware of the timing of when shutdown scenarios would become increasingly expensive, Carroll spoke to the USW regarding the high production costs and retirement costs knowing that if he did not get the reduction in these costs from the USW, a massive furlough, if not total furlough of the Johnstown facility's workforce would be considered; Carroll asked the USW to participate in mid-term negotiations where FCA would seek concessions from the USW's CBA; Carroll intended to keep the Johnstown facility open if he attained the concessionary goals (Defendant's Ex. 22) and allowed time enough for these negotiations to occur (approximately eighteen months); by the time midterm negotiations end in January 2007, FCA had lowered its original demand of $15 to $13 per hour in concessions, but the USW did not meet this request; Carroll put into place his plan of shifting work to the other two lower cost facilities at such a time so that furloughs could begin at the Johnstown facility; furloughs began at the Johnstown facility in February 2007 as noticed by Karan under Carroll's continued control as CEO and President of FCA while Ragot had begun the transition to take over for Carroll; the furloughs were specifically timed such that when the furloughs worked their way through the seniority ladder of the USW and approached the special pension group subclass, the furloughs would occur at such a time that FCA knew members of this group would accrue up to two years continuous service credit upon a furlough but when combined with their service time on the job, the members of this subclass would never again work at the Johnstown facility in order to work their necessary one day into their twentieth year to meet the service requirements of their special pensions for the Rule-of-65 pension or accrue the necessary fifteen years for the 70/80 pensions as they were furloughed before completing their thirteenth year of continuous service; Ragot approved the May 31, 2007 second WARN Act notice sent by Karan (or at least does not object to it) and after it was considered as part of the Ragot's appointed Planning Team's "Project Dixie", FOF 156; FCA then was determined to close its Johnstown facility when it gave notice of decisional bargaining in the fall of 2007 and demanded $30 per hour in concessions ($17 more than its final demand and twice its original demand) to keep the facility open.

35. FCA looked to at least enact a massive furlough if not a permanent shutdown of the Johnstown facility if it did not attain the cost concessions (including pension benefits) from the union that it desired. FCA did not seek to proceed immediately with a shutdown because it sought to avoid the triggering of special pension eligibility for the members of its workforce and preferred to keep them employed, but at a lower cost than what was bargained for under the CBA. However, FCA continually considered its options concerning furloughs and shutdown and the timing of these events was chosen based upon the most advantageous economic scenario for FCA, particularly with regard to saving pension costs by preventing as many employees as possible from accruing pension benefits.

36. In evaluating the most economically advantageous time for a shutdown, special pensions were

focused upon by FCA.

37.    When FCA did not obtain the $15 or the $13 per hour concessions from the USW that it sought, considering the lower cost of production at FCA's Danville and Roanoke facilities, what limited work FCA had was shifted to these other two facilities, there was no need to continue work at the Johnstown facility and the decision was made to begin the furlough of its employees and a potential shutdown. FCA had planned for a potential shutdown of the Johnstown facility by sometime in 2008 if not before the termination of the CBA on May 15, 2008. HT at pp. 84-85, 149-152, HT II at pp. 102-103, 122, Defendant's Exs. 16, 19, 23. Plaintiffs' Exs. 1, 3, 4, 6, 7, 9, 10, 11, 13, 14, 16, 57. **The cost of such a shutdown was the driving force behind its timing and with the possibility of adding additional persons to the pension rolls being one important factor in the cost considerations of the shutdown if not the determinative factor.** *See* HT at pp. 121-125. Considering the market circumstances for the rail car industry (including the **expected** industry-wide downturn, see FOF 67), the shutdown decision was made for the purpose of limiting FCA's costs and liabilities, including special pensions to be realized because the 70/80 pensions would be payable upon shutdown, but that a shutdown would also cause a break in continuous service being accrued by all of those of the special pension group subclass currently furloughed. Additionally, with a permanent shutdown of the Johnstown facility, there would be no hope for a recall of furloughed class members so that they may attain the necessary service time under the CBA to be eligible for their special pensions and FCA would not have to concern itself with another negotiation for the extension of the CBA come May 15, 2008. Had FCA been able to continue production at the Johnstown facility, the special pensions would not be a factor because the potential pensioners would continue to work, but the high costs of production at Johnstown destroyed any hopes of continued production in that facility, especially after an industry downturn in orders generally. While mid-term negotiations were still on-going, FCA expected as part of its liabilities the need to realize those pensions for individuals who would be eligible for a pension in 2008 assuming a shutdown occurred in 2008 assuming sufficient work existed for the Johnstown facility until the end of the CBA as it never intended to extend the CBA. In fact these liabilities for the approximately 26 additional persons who would be eligible for special pensions on or before May 15, 2008 were cheaper than the liability resulting from guaranteed work demanded by the USW and it was offered in exchange for the absence of guaranteed work. *See* FOF 95, 97. FCA thus made an offer on June 14, 2006 to the union as to such employees, but the union did not consider it. HT at p. 96; FOF 95. FCA was aware that such an informal offer would not be accepted by the USW in light of the few persons who would benefit from it versus the many who would not. All other employees who would become eligible for the age and service requirements of special pensions after May 15, 2008 were never considered because the shutdown of Johnstown would prevent any further accrual of age and service requirements. **When the industry conditions for a shutdown ripened, FCA implemented furloughs at times that were calculated to ensure the inability of any member of the special pension group subclass to become eligible for a special pension.**

90

38. The layoffs and the closure are a part of the same plan which is akin but not entirely similar to the scheme analyzed by the Sixth Circuit in *Alexander v. Bosch Automotive Systems, Inc.*:

> The alleged unlawful act in this case was not Bosch's decision to lay off Plaintiffs; rather, it was Bosch's intentional timing of the layoff and plant closing to deprive Plaintiffs of plant closure benefits. This scheme involved both the layoff and the closure, and it was not fully implemented until Bosch's May 11, 2000, announcement of the plant closing. Moreover, Plaintiffs did not learn that they would be deprived of benefits until the May 11, 2000, announcement.

*Alexander v. Bosch Automotive Systems, Inc.*, 232 Fed.Appx. 491, 495 (6th Cir. 2007) *petition for cert. filed*, (January 3, 2008)(No. 07-891).

39. Despite both the fact that market conditions figured in the decision to shutdown and FCA's denials that they wanted to shutdown Johnstown, the actions taken by FCA were an implementation of a plan to reduce and eliminate their workforce in Johnstown by the end of 2007 in order to minimize shutdown costs, including and in particular the avoidance of special pensions.

40. Carroll's statements to the effect that the members of the special pension group subclass would never receive their pensions was based upon FCA's plan that in the absence of obtaining its financial goals from negotiations with the USW, FCA would begin a massive furlough and eventually shutdown the Johnstown facility prior to the employees in the two class action subclasses attaining the age and service requirements because by this means FCA could eliminate FCA's legacy costs of special pensions.

41. Jastrzab's notes confirm that as of July 21, 2005, FCA was considering opening a new plant and only keeping those employees in Johnstown with at least twenty years of service working because FCA "[c]annot take on anymore legacy costs." Plaintiff's Ex. 29, pp. 1, 2, 4. When questioned by the Court as to the accuracy of the notes, Karan did not disagree with this portion of Jastrzab's notes. HT II, pp. 217-220. This was during July of 2005 when there was an upswing of business for the rail car industry, *see* Defendant's Exhibit 1, and only six months after the current collective bargaining agreement went into effect. Thus, the timing of FCA's decision to engage in a policy of seeking reduction of costs at the Johnstown plant was driven by what was previously known in 1999 and 2000 as the "sweet spot." HT II, pp. 214-215, Plaintiffs' Exhibit 6. In the absence of the desired concessions from the Union, FCA would need to decide if a shutdown of the Johnstown facility should occur. However, prior to ordering a shutdown, FCA began a furlough process to remove employees from active work to prevent their eventual accrual of the age and service requirements through the end of the CBA. The timing of the furloughs was then based upon FCA's decision to lessen any eventual shutdown costs because the Rule-of-65 and 70/80 pensions would only be realized as a cost upon a furlough of over two years, or alternatively in the case of the 70/80 pensions, a permanent

91

shutdown of the plant. Having already made a decision to shutdown the plant by the expiration of the CBA in the absence of union concessions, the timing of the furloughs was motivated by FCA's intent to avoid FCA's obligations under the special pensions and thus were actions that violate 29 U.S.C. § 1140.

42. FCA's decision to furlough its employees at different points in 2007 was made with the age and accrued service requirements being a factor in the decision to furlough and the timing of the furlough. Thus, the furloughs and their timing had as a "determinative factor" a discriminatory motive to interfere with the Rule-of 65 and 70/80 subclasses's eligibility for their pensions by preventing them from attaining the necessary age and service requirements for those pensions. *See Gavalik* at 860. The timing of Carroll's comments as noted by Jastrzab evince the fact that FCA had as its policy the intention to furlough those persons approaching the necessary service and age requirements of special pensions within the term of the current CBA, whether or not the rail car industry backlog of orders remained high or low. Therefore, the decision to furlough by FCA was determined by a goal to prevent any further pension obligations from arising when FCA shutdown the Johnstown facility.

43. Having demonstrated their *prima facie* claim, the Plaintiffs' burden of production now shifts to FCA to demonstrate a "legitimate, nondiscriminatory reason for the adverse employment action" *McDonnell Douglas, supra*.

44. FCA argues that the present condition of its industry presents economic challenges because demand for rail cars is lower and the USW did not consent to concessions in the terms of the CBA to lower Johnstown's costs compared to the other two FCA facilities. Defendant's Proposed COL 31 (Document No. 57).

45. The Court finds that the rail car industry is currently experiencing a downturn and therefore, FCA has produced a non-discriminatory reason for its action in furloughing the Plaintiffs' subclasses along with all other USW members furloughed.

46. The burden of production thus returns to Plaintiff Sowers and Zanghi to offer evidence that FCA's given reason is in fact pretext. "A plaintiff 'may succeed in this either directly by persuading the court that the discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *DiFederico v. Rolm Co.,* 201 F.3d 200, 206 (3d Cir. 2000)(citation omitted).

47. The evidence in favor of the presence of pretext includes the fact that mid-term negotiations for concessions began in the Fall of 2005, a period of time when there was an upswing of freight car deliveries, *see* Defendant's Ex. 1, unlike the current downturn.

48. Ragot's press release accompanying FCA's Form 8-K dated December 18, 2007 (Document No. 80-2) which announced the imminent closure of the Johnstown facility, related that "cost

control" was the motivation to close. The form mentions the "challenging railcar market", but it does not indicate that the decision was based upon a decline in backlog or customer orders, only that "we and the union did not reach an agreement that would have allowed us to continue to operate the facility in a cost-effective way." *Id.*

49. The mid-term negotiations began with a $15 demand from FCA, which was eventually lowered to $13 by Carroll at the end of 2006, *see* Defendant's Ex. 25, which then increased to a demand of $30 concessions in decisional bargaining in the Fall of 2007. FOF 166. Such a change in FCA's demand for concessions can be interpreted two ways: 1) the added $17 reflected necessary reductions in light of the industry downturn in 2007, which in turn means that the original demands of $15 and $13 respectively were not reasonably tied to expected industry downturns (*see* FOF 67) and thus the furloughs that began in March and continued in July were based on a desire to avoid financial liabilities under the CBA provisions, including accrual of special pension rights or 2) the $30 demand in the Fall of 2007 did not reflect a downturn in the market but was only a disingenuous offer that FCA knew the USW would never agree to and that would allow FCA to claim the need to shutdown the Johnstown Facility at a time that would prevent the continued accrual of those Plaintiffs' service time while on furlough and avoid a further extension of the CBA which would have kept a workforce in Johnstown that was bound to retire with benefits that were comparatively better than FCA's employees at its other two facilities.

50. Despite FCA's claim that Roanoke was its most efficient facility, *see* Defendant's Proposed COL 31, Whalen, co-chair for the Planning team, could not explain the fifteen percent efficiency factor recognized by Project Dixie. FOF 158; Defendant's Ex. 14, p. D-2938; HT p.200-201.

51. Additionally, Carroll knew that he could not guarantee employment to the USW and his final offer was a market-based guarantee to build up to 1,000 cars at the Johnstown facility, yet he chose to build 300 freight cars on speculation at Johnstown, the highest cost facility after breaking off negotiations with the USW. *See* Defendant's Proposed COL 31, Defendant's Exs. 25, 26, FOF 146. Therefore, the Court finds this not to be a genuine effort on the part of FCA to attempt to keep the Plaintiffs' subclass employed, but in fact a planned failure.

52. Therefore, the Court finds that the Plaintiffs have proven that the reasons given by the Defendant are "unworthy of credence" which leads the Court to conclude that FCA discriminated against the Plaintiffs' subclass of the special pension group with the specific intent to interfere with the pension rights of those employees.

53. Thus, the Court finds at this juncture that Plaintiffs Sowers and Zanghi have proven the likelihood of their success on the merits on behalf of their special pension group subclass whether utilizing direct or circumstantial evidence.

93

## 2. Irreparable Harm to the Plaintiffs

54.     Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief. Therefore, if a trial on the merits can be conducted before the injury would occur there is no need for interlocutory relief. In a similar vein, a preliminary injunction usually will be denied if it appears that the applicant has an adequate alternate remedy in the form of money damages or other relief.

11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995)(footnotes omitted).

55.     The special pension group subclass will suffer irreparable harm in that they will not be permitted to attain through continued employment the necessary age and service requirements for their eligibility for their special pensions; this group has amassed service time within less than three years from attaining the service time requirements. In the event of the imminent shutdown of the Johnstown plant, they will never be able to accrue these two necessary prerequisites to their pensions.

56.     In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm. *See e.g., Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 356 and n. 9 (3d Cir.1980).

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)

57.     All subclasses have demonstrated irreparable harm as the nature of the issues bound up in ERISA actions under 29 U.S.C. § 1140 cannot be resolved quickly. The subclasses currently have a window of two years of pension accrual while on furlough that terminates on two years and one day. Moreover, the announced shutdown of the Johnstown facility can officially occur any day leaving those without the necessary service and age requirements for their special pensions or the service requirements for the deferred vested pensions without the pension eligibility they would have otherwise attained with their continued service with FCA. Reinstatement is the only remedy to save the pension rights of the subclasses, *see Eichorn,* 484 F.3d at 654-657, and a plant shutdown would prevent even a reinstatement from being a possible remedy, leaving the subclasses without any remedy under ERISA to enforce their pensions rights if they succeed on the merits. *See Gavalik* at 857, n. 40. *See also Alexander,* 232 Fed. Appx. at 497. After a shutdown this Court would be powerless to order the requested

remedy of reinstatement.

58. Despite the arguments of the Plaintiffs, *see* Plaintiffs' Proposed COLs 47-49 (sealed), the Court does not find that the loss of wages to the subclasses during a furlough is a factor in considering the irreparable harm; backpay is not a permissible damage for the Plaintiffs for a claim under 29 U.S.C. § 1140 and cannot be used to otherwise justify the permitted equitable remedy of reinstatement. *Eichorn*, 484 F.3d at 656.

59. No money damages or other legal remedy can provide the plaintiffs with any relief from the loss of the ability to work toward their age and/or service time requirements under their pension plans.

60. The Plaintiffs have satisfied the requirement to demonstrate irreparable harm to both subclasses should an injunction not issue, particularly in light of the imminent permanent shutdown of the plant.

### 3. Irreparable Harm to FCA and balancing of the harms

61. FCA will invariably suffer economic harm in operating a facility that it expected to shutdown. It will have to employ a limited workforce that could include both subclasses which results in not only operation expense, salaries, continued pension and welfare benefits that must be paid, but also the cost of shifting work from its Danville and Roanoke plants and carrying Johnstown as an operating asset rather than proceeding with a shutdown.

62. The latest information provided to the Court demonstrates that the economic conditions within the freight car production industry have declined and backlogs for all manufacturers in the industry are in decline, meaning less orders for products are being received. Added employment during a time of an industry downturn will not be a welcome expense to FCA.

63. FCA in turn is likely to reduce its production at other facilities to comply with any order of reinstatement at the Johnstown facility which may result in grievances from the bargaining units at the Danville or Roanoke facilities. FCA will also likely face grievances by those members of the USW Local 2635 from the Johnstown facility who are not recalled because they may have greater seniority than those ordered to reinstatement.

64. Balancing these economic harms to FCA which most certainly would amount to a large amount of money, mostly because of the cost in operating a third plant with a limited workforce versus the complete loss of pension and welfare benefits the right to which members of the special pension group subclass have been accruing for at least twelve years (*i.e.* the potential 70/80 pensioners), but that will never be realized by the subclasses, it appears that FCA's burden will outweigh the subclasses in a monetary sense; however, the pension plan and welfare plan rights that were accruing for the subclasses represent a significant amount of money, and the absence

95

of the limited monetary benefits that would be paid to the subclasses, particularly the special pension group subclass, will result in a devastating loss to those individuals and families who had not expected that their pension rights would be denied. Additionally, with production occurring in the Johnstown facility rather than in the other two facilities, FCA is obtaining the benefit of that production, despite its higher cost relative to Danville and Roanoke; therefore, denying the motion would result in the Plaintiffs never being able to satisfy the age and/or service requirements of their pension plans and obtain the related welfare benefits while FCA continues to operate in Danville and Roanoke rather than Johnstown. Therefore, the Court finds that the relative harms of the parties weigh in favor of the Plaintiffs.

## 4. The Public Interest

65. The Plaintiffs cite *American Telephone and Telegraph Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427, n. 8 (3d Cir. 1994) for the following statement therein: "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff. Nonetheless, district courts should award preliminary injunctive relief only upon weighing all four factors. *See Duraco Prods., Inc. v. Joy Plastic Enter., Ltd.*, 40 F.3d 1431, 1438 (3d Cir.1994)."

66. ERISA itself sets forth a policy to protect the beneficiaries of pension and welfare plans. See 29 U.S.C. § 1001.

67. It is in the public interest that employers/fiduciaries like FCA adhere to their contractual commitments and not seek to take actions to avoid such commitments for the betterment of corporate gain and to the detriment of other parties to the contract that are powerless to maintain the status quo of such commitments when such employers/fiduciaries possess the means to illegally evade these commitments. Not only the local economy of Johnstown but the national economy is affected when national companies such as FCA evade obligations under pension and welfare plans. Enforcement of ERISA's policy to protect pensions is beneficial to FCA's union employees at Danville and Roanoke despite the fact that FCA may choose to seek reductions in their workforces in order to comply with this Court's Order; in the future it is possible one of these two groups may seek similar relief under ERISA.

## 5. **Bond**

**(c) Security.** The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security.

Federal Rule of Civil Procedure Rule 65.

The Court must now determine what bond is appropriate for the issuance of the preliminary injunction. The Plaintiffs propose that no bond shall issue. Plaintiffs' Proposed COLs 66-71 (Sealed). The Court of Appeals for the Third Circuit has made it clear that the absence of a bond in a preliminary injunction is a "rare" instance that must be supported by findings of the court as to the "potential financial hardships" that are to be balanced to make such a determination. *Elliot v. Kiesewetter*, 98 F.3d 47, 59-60 (3d Cir. 1996). In the case of *Temple University v. White*, 941 F.2d 201, 219-220 (3d Cir. 1991), the Third Circuit adopted a test used for the First Circuit in determining if no bond is required. The test has three considerations: 1) " the possible loss to the enjoined party"; 2) "the hardship that a bond requirement would impose on the applicant"; and 3) "the impact that a bond requirement would have on enforcement on [important federal rights or public interests], in order to prevent undue restriction of [them]." *White* at 220 (internal quotations and citations omitted).

The Court finds that the loss to the enjoined party, FCA, is potentially great considering that the two subclasses must be reinstated to employment which will require that work be shifted from FCA's other facilities back into the Johnstown facility, a costly proposition alone. Added to this cost is the expense of operating the Johnstown facility with limited employees who are paid a higher wage than the other two facilities. These expenses to FCA are balanced against the ability of the three named

plaintiffs to post a bond equal to the hundreds of thousands of dollars (maybe even a higher figure) that FCA will incur by keeping the Johnstown facility open. Certainly if any one of the three named Plaintiffs could post a bond in an amount to satisfy even a significant portion of these corporate expenses, the fact of their furloughs would not have dealt such an economic blow to them. Additionally, in consideration of the third factor of important federal rights or public interests, if an amount of an injunctive bond would have to match an employer's expenses in reversing an action of closing a production facility in all cases, preliminary injunctions would seldom if ever issue in ERISA claims such as this one to protect rights intended to be safeguarded by ERISA. The public interest in preventing employers from avoiding their pension liabilities would be continually overruled when an employee, or small number of employees, of modest means seeks to redress an ERISA violation stemming from an employer's multimillion dollar actions or even actions that are valued in the tens of thousands of dollars.

While a bond equal to FCA's expenses and liabilities in keeping its Johnstown facility open and operating with work for up to 182 employees would be beneficial to FCA, it is impossible to meet by the named Plaintiffs. In its discretion under Federal Rule of Civil Procedure 65(c), the Court will order a nominal bond of $50.00 per each of the three named Plaintiffs, without prejudice to later requiring a larger bond.

## C. Conclusion

Weighing each of the requisite factors the Court finds that a preliminary injunction reinstating the special pension group subclass is warranted as this subclass has demonstrated that despite the economic harm to FCA, its members' harms are much greater in the absence of a preliminary

98

injunction, in addition to the fact that it has demonstrated a likelihood of success on the merits and that the public interest is in favor of FCA adhering to its obligations with respect to pensions it provides to its employees who are members of the USW.

The Court also finds that a preliminary injunction shall issue ordering FCA to reinstate the deferred vested pension group subclass. Although at this stage of the case this subclass has not demonstrated a likelihood of success on the merits, the balancing of respective harms between the subclass and FCA clearly favors the subclass in addition to the public interest favoring the reinstatement of the subclass in order to prevent loss of service credit accrued.

This Memorandum Opinion is filed in support of and as the reasoning for the Order filed on January 11, 2008.